**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| BANKDIRECT CAPITAL FINANCE, LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| CAPITAL PREMIUM FINANCING, INC., | ) Case No. 15 C 10340 |
| Defendant, | ) |
|  | ) Judge Joan B. Gottschall |
| CAPITAL PREMIUM FINANCING, INC., | ) |
| Counter-Plaintiff, | ) |
| v. | ) |
| BANKDIRECT CAPITAL FINANCE, LLC; BANKDIRECT CAPITAL FINANCE, a division of Texas Capital Bank National Association; and TEXAS CAPITAL BANK NATIONAL ASSOCIATION, | ) |
| Counter-Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In November 2015, BankDirect Capital Finance, LLC ("BankDirect") filed suit against

Capital Premium Financing, Inc. ("Capital Premium" or "CPFI") alleging breach of contract.

Capital Premium responded by filing a counterclaim against BankDirect, and the litigation

proceeded in relatively typical fashion until May 1, 2017, when BankDirect seized control of

certain of Capital Premium's bank accounts and took (or threatened to take) a number of further

actions that, according to Capital Premium, are unauthorized and will drive it out of business.

Before the court is Capital Premium's motion to enjoin BankDirect's actions. For the reasons explained below, the motion is granted.[1]

## I. Background

BankDirect and Capital Premium are in the business of financing commercial insurance premiums. Essentially, they loan money to businesses who wish to pay their insurance premiums in a single lump sum. BankDirect specializes in lending money to large businesses; Capital Premium makes loans to small and mid-sized businesses. The parties were introduced to each other in 2010, at a time when Capital Premium was searching for new funding sources. After several months of negotiating, the parties settled on an arrangement according to which BankDirect would finance Capital Premium's growth for a period of five years ("the five-year

---

[1] Although Capital Premium's motion sought both a temporary restraining order (TRO) and a preliminary injunction, the court here focuses only on the request for a preliminary injunction. While both types of relief require the same showing, *see, e.g.*, *Sw. Airlines Pilots' Ass'n v. City of Chi.*, 186 F. Supp. 3d 836, 839 (N.D. Ill. 2016), a "temporary restraining order serves a purpose different from that of a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009). Specifically, the "purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Id.* (quotation marks omitted); *see also* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2951, at 254 (2d ed. 1995) ("[A TRO] is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction."). Here, the parties independently agreed to maintain the status quo shortly after Capital Premium filed its motion. The parties also had an opportunity to brief the issues at length and to present evidence at a hearing lasting two full days. Under these circumstances, courts have routinely treated motions seeking both TROs and preliminary injunctions as motions for preliminary injunctions. *See, e.g.*, *Smith v. Frank*, 99 F. App'x 742, 743 (7th Cir. 2004) (treating lower court's opinion as issuing a preliminary injunction rather than a TRO where the "court gave the non-moving party notice and an opportunity to be heard, conducted a full hearing, and contemplated whether to grant relief pending trial"); *Amoroso-Levato v. Batavia Sch. Dist. 101*, No. 06 C 6201, 2006 WL 3343776, at *1 (N.D. Ill. Nov. 15, 2006) ("Here, defendants had notice of the motion for a temporary restraining order in addition to the opportunity to brief their opposition and to appear for oral argument. In light of these circumstances, we will treat plaintiff's motion for a temporary restraining order as one for a preliminary injunction."); *see also Levas & Levas v. Vill. of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982) ("There was no reason for the judge to hold a second evidentiary hearing, explicitly denominated a hearing on the Levases' motion for a preliminary injunction, when the first hearing had already served that function.").

period") by purchasing loan originated by Capital Premium. After the five-year period, BankDirect would have the option of purchasing Capital Premium's assets.[2]

This arrangement, which the parties refer to as the "transaction facility," was enshrined in several agreements executed by the parties in December 2010. The broader aspects of the parties' relationship were governed by a Master Transaction Agreement ("MTA"). *See* Pl.'s 3d Am. Compl., Ex. A, ECF No. 160-1. Various specific aspects of their relationship were governed by several subsidiary agreements. For purposes of this motion, the relevant agreements are the following:

> **Loan Purchase, Sale, and Servicing Agreement ("LPSSA"):** this agreement sets forth the terms according to which BankDirect was obligated to buy loans originated by Capital Premium, and the terms according to which Capital Premium would act as the servicer of those loans. *See* Pl.'s 3d Am. Compl., Ex. C, ECF No. 160-3.

> **Option Agreement**: this agreement specified the terms according to which BankDirect would have the right to purchase Capital Premium's assets at the end of the five-year period. Attached to the Option Agreement was a draft Asset Purchase Agreement ("APA"), which set the purchase price for Capital Premium's assets based on a multiple of its earnings during particular years. *See* Pl.'s 3d Am. Compl., Ex. B, ECF No. 160-2.

> **Marketing Collaboration Agreement**: the MTA required BankDirect and Capital Premium to enter into a Marketing Collaboration Agreement within ninety days of the MTA's execution that would enable the parties to use their respective resources efficiently during the five-year period (by, for example, avoiding duplication of each other's efforts, and using each other's personnel to market one another's products).

> **Participation Agreement**: this agreement permitted Capital Premium to purchase an interest in the loans that it had originated and sold to BankDirect. Capital Premium made these purchases using cash from its Agency Funding Participation Program ("AFP Program"), which allowed Capital Premium's clients (principally retail insurance agencies) to purchase an interest in Capital Premium's loan portfolio. *See* Pl.'s 3d Am. Compl., Ex. E, ECF No. 160-5.

---

[2] The parties dispute precisely which assets BankDirect would be permitted to purchase.

**Acknowledgment Agreement**: this agreement was entered into in July 2011, after Texas Capital Bank National Association ("TCB"), which owns a majority interest in BankDirect, created a "BankDirect-related division" ("the BDCF Division"). The Acknowledgement Agreement provided that BankDirect could cause either BankDirect or TCB's BDCF Division to purchase CPFI's loans. *See* CPFI Answer & Counterclaim, Ex. 5, ECF 11-1.

By all accounts, both parties profited substantially during the five-year period, and in late 2014 or early 2015, BankDirect notified Capital Premium of its intention to exercise its right to purchase Capital Premium's assets under the Option Agreement. However, Capital Premium refused to execute the Asset Purchase Agreement. In June 2015, Scott Crowley ("Crowley"), Capital Premium's Chief Financial Officer, sent an email to Stephen Gentry ("Gentry"), BankDirect's Executive Senior Vice President and Chief Financial Officer, listing various respects in which it alleged BankDirect's performance during the five-year period had negatively affected Capital Finance's growth. *See* Pl.'s 3d Am. Compl., Ex. I, Email from S. Crowley to S. Gentry (June 23, 2015), ECF No. 160-9.

First, Crowley cited BankDirect's obligation under the MTA to execute a Marketing Collaboration Agreement with Capital Premium. Capital Premium claims that after the parties entered into the MTA, it made presentations to BankDirect's sales representatives designed to help them promote Capital Premium's loan volume, but that BankDirect never took these measures (or any others) to increase Capital Premium's business, and refused to cooperate with Capital Premium's attempts to develop a Marketing Collaboration Agreement. Second, Crowley cited BankDirect's acquisition of Standard Funding Corporation ("Standard Funding") in 2011. Capital Premium claims that Standard Funding is one of its direct competitors and asserts that BankDirect's purchase of the company conflicted with its obligation to promote Capital Premium's growth. Capital Premium additionally alleges that BankDirect was negotiating its purchase of Standard Funding during the same period that it was negotiating the MTA with

Capital Finance. According to Capital Premium, BankDirect deliberately concealed its intention to acquire Standard Funding, and Capital Premium insists that it would not have entered into the MTA if it had known of BankDirect's plan. Third, Crowley claimed that Capital Premium experienced additional administrative burdens as a result of the Acknowledgment Agreement. According to Capital Premium, the fact that its loans could now be purchased by either BankDirect or TCB's BDCP Division meant that Capital Premium was required under the U.S. Bank Secrecy Act to collect the federal taxpayer identification numbers of its customers. Crowley stated that this and other requirements put Capital Premium at a disadvantage vis à vis commercial premium lenders who were not subject to these regulations.

According to Capital Premium, BankDirect's conduct was part of a concerted effort to stifle Capital Premium's growth during the five-year period, thereby ensuring that it would pay a lower price for Capital Premium's assets. Capital Premium contends that the Asset Purchase Agreement's purchase price formula significantly understated the company's market value, and claims that it nevertheless agreed to the formula based on BankDirect's representations that it would take aggressive steps to increase Capital Premium's earnings during the five-year period. BankDirect claims that Capital Premium had never raised the complaints in Crowley's June 2015 email (or any other complaints), at any time before BankDirect indicated its intention to exercise its purchase option. According to BankDirect, Capital Premium invented these complaints in an attempt to renegotiate a more favorable asset purchase price.

BankDirect regarded Capital Premium's refusal to consummate the Asset Purchase Agreement as an anticipatory breach of the parties' agreement and filed this suit in November 2015. BankDirect's complaint originally asserted a claim for breach of contract seeking specific performance of the Asset Purchase Agreement. It also sought a declaratory judgment that the

Option Agreement and MTA were enforceable and that BankDirect had performed all of its obligations under the agreements. Lastly, BankDirect alleged a claim for breach of contract based on Capital Premium's failure to indemnify it for the legal expenses it had incurred as a result of Capital Premium's refusal to consummate the APA. *See* Compl., ECF No. 1. BankDirect subsequently amended the complaint to assert a breach of contract claim for money damages in the alternative to its claim for specific performance. *See* Pl.'s 2d Am. Compl., ECF No. 40. In November 2017, BankDirect amended its complaint once more to assert a claim for breach of the implied duty of good faith. *See* Pl.'s 3d Am. Compl., ECF No. 160. In addition, BankDirect has withdrawn its claim for specific performance. *Id.*

Capital Premium responded by filing a counterclaim against BankDirect and TCB. *See* CPFI Answer Counterclaims, ECF No. 11. Originally, Capital Premium sought a declaratory judgment rescinding the Option Agreement. It also asserted claims for breach of contract; breach of the covenant of good faith and fair dealing; unjust enrichment; fraud in the inducement; and tortious interference with contract. Capital Premium later dropped its claim for tortious interference and added claims for misappropriation of trade secrets (alleging that BankDirect used Capital Premium's proprietary customer information in attempting to steal Capital Premium's customers), and conversion. *See* CPFI Answer & 2d Am. and Supp. Countercl., ECF No. 128.[3]

---

[3] In July 2016, BankDirect moved for partial summary judgment based on theories of waiver and election of remedies. The court denied the motion. *See BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15-CV-10340, 2017 WL 1196917 (N.D. Ill. Mar. 31, 2017). In May 2017, after filing the present motion, Capital Premium moved for summary judgment as to BankDirect's claims for specific performance, declaratory relief, and monetary damages. *See* ECF No. 102. In October 2017, BankDirect moved to dismiss Capital Premium's claims for misappropriation of trade secrets and conversion. *See* ECF No. 149. Both of the latter motions are currently being briefed.

In February 2016, BankDirect sent Capital Premium a demand letter stating that pursuant to the MTA's indemnification provisions, Capital Premium was obligated to reimburse BankDirect for its legal expenses within ten days. *See* BD Post-Hr'g Br., Ex. E, BankDirect-CPFI Master Transaction Agreement: Indemnification Demand Letter, J. Shockey to S. Crowley (Feb. 19, 2016), ECF No. 147-5. Capital Premium did not respond to the letter. *See* Tr. at 117:21-118:3. BankDirect sent several additional demand letters, which also received no response. Tr. at 118:6-11; BD Post-Hr'g Br., Exs. F-H, ECF Nos. 147-6 to 147-8. On May 1, 2017, asserting that Capital Premium's refusal to pay its legal expenses constituted an event of default under the MTA, BankDirect: (1) seized control of Capital Premium's primary cash management account; (2) transferred $1 million from Capital Premium's account to its own account; (3) seized control of a separate $20 million account in which Capital Premium maintains contributions by participants in its AFP Program (the "Participation Interest Account"); and (4) stated that it intended to terminate the parties' loan-servicing arrangement. *See* CPFI Mem. Supp. PI Mot., Ex. A, Letter from Shockey to Crowley (May 1, 2017), ECF No. 89-1. On May 3, BankDirect sent a letter demanding an additional $5,000,000 from Capital Premium to cover a portion of the $125 million in damages it seeks in the suit. *See* CPFI Mem. Supp. PI Mot., Ex. D, Letter from S. Gentry to S. Crowley at 2-3 (May 3, 2017), ECF No. 89-4. (The foregoing actions are referred to collectively as the "May 1 actions").

One week later, Capital Premium filed the instant motion seeking to enjoin BankDirect's actions. *See* ECF No. 89. The parties entered into an agreement preserving the status quo pending the motion's resolution. *See* Minute Entry, ECF No. 91. Capital Premium continues to originate loans; BankDirect continues to purchase the loans and pay Capital Premium to service them; and BankDirect releases funds on a daily basis from the accounts it has seized so that

Capital Premium is able to cover its expenses. On June 14, 2017, the court heard the testimony of

Capital Premium CFO Scott Crowley; and on September 21, 2017 (following an unsuccessful

settlement conference), the court heard the testimony of Joseph Shockey ("Shockey"),

BankDirect's President and CEO. In addition to the briefing submitted in advance of the hearing,

the parties were given leave to file opening post-hearing briefs and response briefs.

## II. Discussion

### A.     Legal Standard

"A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has

some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it

will suffer irreparable harm if the injunction is not granted." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d

891, 895 (7th Cir. 2001). "If the court is satisfied that these three conditions have been met, then

it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is

granted, balancing such harm against the irreparable harm the moving party will suffer if relief is

denied." *Id*. "Finally, the court must consider the public interest (non-parties) in denying or

granting the injunction." *Id*. "The court then weighs all of these factors, 'sitting as would a

chancellor in equity,' when it decides whether to grant the injunction." *Id*. (quoting *Abbott Labs.

v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). "This process involves engaging in

what we term the sliding scale approach; the more likely the [movant] will succeed on the merits,

the less the balance of irreparable harms need favor the [movant's] position." *Id*.

In its pre-hearing brief in response to Capital Premium's motion, BankDirect pointed out

that the MTA includes a choice-of-law clause providing that disputes between the parties are to

be governed by New York law. *See, e.g.*, MTA § 9.10(a) ("This agreement shall be governed by,

and construed in accordance with, the law of the State of New York, without regard to the

principles of conflicts of laws thereof.") (capitalization removed). As a result, BankDirect argued

that the court should apply the preliminary injunction standard supplied by New York law—

which according to BankDirect, is more onerous than the standard under federal law. For

example, BankDirect contended that under New York law, reputational injury alone is

insufficient to establish irreparable harm. *See* BD Resp. to PI Mot. 20, ECF No. 92 (citing *Litho*

*Prestige, Div. of Unimedia Grp., Inc. v. News Am. Pub., Inc*., 652 F. Supp. 804, 808 (S.D.N.Y.

1986)).

      BankDirect does not press this argument in its post-hearing briefs (indeed, its post-

hearing submissions do not discuss the applicable standard at all), and thus appears to have

abandoned it. *Cf. Boecherer v. Burling Bank*, No. 08 C 1332, 2009 WL 4544695, at \*7 (N.D. Ill.

Dec. 1, 2009) (party was deemed to have abandoned argument advanced in its opening brief by

failing to address it in its reply brief); *Contorno v. Grasser*, No. 08 C 2737, 2009 WL 1292737,

at \*4 (N.D. Ill. May 7, 2009) (same). In any case, BankDirect is incorrect: given that the court's

jurisdiction is based on diversity of citizenship, the parties' choice-of-law provision requires that

New York law be applied to substantive legal questions, but federal law governs the preliminary

injunction standard. *See, e.g*., *Arthur J. Gallagher Serv. Co. v. Egan*, No. 12-80361-CIV, 2012

WL 12839373, at \*10 (S.D. Fla. June 29, 2012) ("[T]he Court finds that even though the parties

included a choice of law provision in the Executive Agreement whereby Florida law applies,

such does not govern the considerations of whether a preliminary injunction will issue."); *Seda*

*Specialty Packing Corp. v. Am. Safety Closure Corp*., No. 95 CIV. 4745 (LMM), 1995 WL

404821, at \*2 (S.D.N.Y. July 7, 1995) ("[T]he standard for granting a preliminary injunction is

provided by federal law, not by New York state law, even in a diversity action, and even though

the parties specified New York law in a 'choice of law' provision in their escrow agreement.");

*see also TP Grp.-Ci, Inc. v. Smith*, No. 16 C 7463, 2016 WL 6647947, at *8 (N.D. Ill. Nov. 10, 2016) ("Federal courts sitting in diversity apply state substantive law and federal procedural law. So while federal law supplies the test for the availability of a preliminary injunction, the Court applies substantive Delaware law pursuant to the choice-of-law clause.") (citation and quotation marks omitted).[4]

**B.     Likelihood of Success on the Merits**

The court first considers whether Capital Premium has shown a likelihood of success on the merits. "A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). The Seventh Circuit has consistently characterized this threshold as a "low" one. *Id*.

As traditionally formulated, the moving party is required to show a likelihood of success on the merits of "at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc*., 549 F.3d 1079, 1096 (7th Cir. 2008). Typically, this inquiry focuses on the merits of the claims asserted in the underlying litigation. In this case, however, the merits of the causes of action asserted in the parties' pleadings are not directly at issue. This is because BankDirect's purported justification for the May 1 actions is not the claim asserted in its complaint—i.e., that Capital Premium defaulted under the MTA by failing to consummate the

---

[4] Ultimately, the issue does not affect the outcome of this motion. The court's conclusion would be the same even under New York's putatively more rigorous standard.

Asset Purchase Agreement. Instead, BankDirect maintains that its actions were authorized due to Capital Premium's rejection of its demands for indemnification.

To be sure, BankDirect brought this suit, and thus incurred its legal expenses, based on its contention that Capital Premium breached the MTA by refusing to execute the APA. It might thus appear that whether BankDirect is entitled to indemnification turns on the ultimate question of whether Capital Premium was obligated to execute the APA. However, as is discussed more fully below, BankDirect took the May 1 actions based on the proposition that Capital Premium committed an event of default under the MTA by refusing to pay BankDirect's legal expenses within ten days of its demand—i.e., prior to any independent adjudication of whether Capital Premium was obligated to consummate the sale of its assets. Hence, to determine whether the May 1 actions were authorized or whether they may be enjoined, the relevant question is whether Capital Premium was indeed required to indemnify BankDirect upon its demand at this stage of the litigation.[5] The parties are in fact in agreement on this point. *See* BD PI Resp. Br. 22 n.3

---

[5] While the parties' post-hearing briefing focuses chiefly on this issue, they secondarily address the ultimate question of whether Capital Premium breached the MTA by failing to execute the APA. As an aside, the court points out that, insofar as the underlying merits are implicated in the motion, Capital Premium frames the issue as whether *BankDirect* is likely to succeed on *its* claims. However, case authority suggests that in deciding a motion for a preliminary injunction, the court must consider the claims of the moving party; and thus, when a defendant moves for a preliminary injunction, the court must consider the merits of the defendant's counterclaims. *See, e.g.*, *Profil Institut Fur Stoffwechselforschung GmbH v. ProSciento, Inc.*, No. 16CV1549-LAB (BLM), 2017 WL 1394089, at *1 (S.D. Cal. Feb. 28, 2017) ("Federal courts can issue preliminary injunctions only to the extent they pertain to pending underlying claims…. Where, as here, the party is bringing no claims, there is no basis for issuance of a preliminary injunction. And in fact, the Court lacks authority to do so.") (citations omitted); *Kraemer v. Fox Hills Owners Ass'n*, No. 15-CV-02189--MJW, 2016 WL 1383473, at *1 (D. Colo. Apr. 7, 2016) (denying defendant's motion for a preliminary injunction "for the simple fact that it hasn't asserted any counterclaims on which to succeed"). In this case, the distinction has little practical significance because, insofar as the parties accuse one other of breaching the MTA, Capital Premium's counterclaim is the mirror image of BankDirect's complaint. Hence, the question of whether BankDirect is likely to succeed on the merits of its claims necessarily raises the question of whether Capital Premium is likely to succeed on the merits of its claims.

("For purposes of responding to the Injunction Motion, BankDirect relies upon, and thus the Court need only consider, the Events of Default related to CPFI's Indemnity obligations."); CPFI PH Br. 13 ("Thus, the only issue on the likelihood of success on the merits is whether Capital Premium has shown some likelihood that BankDirect was not entitled unilaterally to demand the payment of its legal fees with no support and no oversight.").[6] To this question the court now turns.

### 1. The MTA's Indemnification Provisions

Capital Premium's indemnification obligations under the MTA are set forth in § 9.05, which provides that the parties will generally cover their own expenses, except that "CPFI shall pay all reasonable fees, costs and expenses incurred by BankDirect (including, without limitation, all reasonable fees, charges and disbursements of counsel), in connection with any Default or the enforcement or protection of its rights … under or in connection with this Agreement and the other Transaction Documents, including its rights under this section." MTA § 9.05(a). BankDirect further contends that Capital Premium's failure to fulfill its indemnification obligations constitutes an "Event of Default" under the MTA, and that under the MTA, this permits it to terminate Capital Premium's right to service loans and to seize Capital Premium's accounts and funds. For its part, Capital Premium does not dispute BankDirect's right to take such measures if an event of default has occurred. However, it denies that it committed an event of default by refusing to pay BankDirect's legal expenses up front. More specifically, Capital Premium challenges BankDirect's authority to decide unilaterally whether Capital Premium is required to indemnify it.

---

[6] The court notes that BankDirect alleges that Capital Premium committed several other events of default under the MTA. *See* BD Post-Hr'g Br., Ex. I, CPFI Event of Default Notices, ECF No. 147-9. However, BankDirect explicitly states that it does not rely on these other alleged defaults for purposes of this motion. *See* BD PI Resp. Br. 22 n.3.

BankDirect points out that there is no language in § 9.05(a) requiring it to obtain any formal ruling or independent determination before declaring a default and demanding indemnification. BankDirect also points out that the separate indemnity provision in the Asset Purchase Agreement is quite lengthy and spells out in great detail the procedures a party must follow before claiming a default. According to BankDirect, the omission of such language from the MTA shows that the parties expressly decided not to impose any restrictions on BankDirect's ability to demand indemnification under the MTA. Rather, BankDirect insists, the MTA's indemnity obligations are "self-executing."

The problem with this reading of § 9.05 is that, taken to its logical conclusion, it would permit BankDirect to demand indemnification from Capital Premium whenever it wished, no matter how frivolous the grounds, and no matter how extravagant the cost, based on nothing more than its *ipse dixit*. *See, e.g.*, Pl.'s Resp. to PI Mot. 28 (asserting that "BankDirect is not required to demonstrate the reasonableness of its attorneys' fees in order for an Event of Default to exist"). In short, this reading of the MTA would essentially leave Capital Premium at BankDirect's mercy. New York law, like the law of other jurisdictions, disfavors interpretations that lead to such commercially unreasonable results. *See, e.g.*, *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13 CIV. 3241 JMF, 2014 WL 1807098, at *5 (S.D.N.Y. May 6, 2014) ("[I]t is black-letter contract law that 'a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided.'") (quoting *16W Ltd. P'Ship v. Xanadu Mezz Holdings LLC*, 95 A.D.3d 498, 503 (N.Y. App. Div. 2012)); *Rubinger v. Int'l Tel. & Tel. Corp.*, 193 F. Supp. 711, 721 (S.D.N.Y. 1961) ("A construction placing one of the parties to a contract at the mercy of the other is to be avoided."); *Pearce v. Knepper*, 53 N.Y.S.2d 845, 846 (Sup. Ct.

1945) ("[T]he court wherever possible will endeavor to avoid a construction which would result in placing one party to a contract at the mercy of another."); *see also XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1005 (7th Cir. 2004) ("Contract interpretations that produce commercially unreasonable results are disfavored, not as a matter of policy but simply because they are implausible to impute to the parties.").[7]

Putting aside BankDirect's interpretation of § 9.05(a), Capital Premium contends that BankDirect's position fails under § 9.05(b). Section 9.05(b) elaborates on the indemnity obligations mentioned in § 9.05(a) and applies them to all costs "arising out of, in connection with … any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by CPFI, and regardless of whether any Indemnitee is a party thereto." MTA § 9.05(b). However, the provision goes on to say that:

> such indemnity shall not … be available to the extent that [the costs] … are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or … result from a claim brought by CPFI against an Indemnitee for breach in bad faith of such Indemnitee's obligations … if CPFI has obtained a final nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

*Id.*

---

[7] In its post-hearing response brief, BankDirect alternatively argues that an event of default is not a "condition precedent" to invoking Capital Premium's duty to indemnify. This is because, BankDirect asserts, § 9.05(a) requires Capital Premium to reimburse BankDirect for attorneys' fees and costs incurred "in connection with any Default *or the enforcement or protection of its rights*." MTA § 9.05(a) (emphasis added). According to BankDirect, it ultimately does not matter whether an event of default has occurred because it has incurred the attorney's fees in the course of attempting to enforce its rights under the MTA (i.e., its right to purchase Capital Premium's assets and its right to indemnification). But this is little more than a repackaging of its primary argument, and it fails for the same reason: it assumes that BankDirect indeed has a right to the relief it seeks, or at any rate, that BankDirect is the sole arbiter or whether it has those rights. There is no more reason to think that BankDirect may unilaterally make these determinations than that it may unilaterally decide whether an Event of Default has occurred.

A straightforward reading of § 9.05(b) plainly indicates that Capital Premium is not required to indemnify BankDirect for any expenses resulting from BankDirect's willful misconduct. Here, Capital Premium has asserted that BankDirect has engaged in precisely such misconduct (e.g., fraudulently inducing it to enter into the MTA by failing to disclose its intent to purchase Standard Funding). Hence, Capital Premium argues, BankDirect's entitlement to indemnification cannot be determined until there is a final adjudication of Capital Premium's fraud claims.

As BankDirect reads § 9.05(b), Capital Premium is required to indemnify "*unless and until such time as CPFI itself obtains a final non-appealable judgment in its favor* establishing that BankDirect committed gross negligence, willful misconduct or a bad faith breach of the MTA or other Transaction Documents." BD Resp. Br. 4 (BankDirect's emphasis). That is, according to BankDirect, Capital Premium's indemnification obligations are triggered immediately upon BankDirect's demand, and its obligations cease, if at all, only after Capital Premium obtains a final judgment that BankDirect has engaged in willful misconduct. This interpretation is not supported by the provision's text. In particular, BankDirect's use of the word "until" is conspicuously absent from § 9.05(b). Simply put, there is nothing in the provision's language to suggest that, where Capital Premium has alleged misconduct on BankDirect's part, the duty to indemnify arises before those allegations are finally adjudicated.

BankDirect goes on to argue that § 9.05(b) is inapplicable here because Capital Premium's allegations of misconduct are meritless. In particular, BankDirect denies Capital Premium's claim that it was negotiating its purchase of Standard Funding contemporaneously with its negotiation of the MTA with Capital Premium, or that it ever concealed its intention to purchase Standard Funding. BankDirect also points out that Capital Premium was aware in 2011

that BankDirect had purchased Standard Funding but raised no complaints about the issue (or any other) until after BankDirect purported to exercise its purchase option in 2015.

It is unclear precisely when Capital Premium claims it first complained to BankDirect about its acquisition of Standard Funding. However, Crowley appeared to concede during the hearing that his June 2015 email was indeed the first time that Capital Premium raised the issue explicitly. *See* Tr. at 95 :3-9 (Q. And at no point up until your June 23rd, 2015 letter, or email, did you ever raise this as a problem to BankDirect; is that right? Yes, or no. A. It can't be answered with yes or no; there needs to be an explanation with that. But in those words you just asked that question, no."). But the fact that Capital Premium did not broach the issue sooner does not mean that its allegations are untrue. Capital Premium points out that BankDirect's own complaint originally asserted that "BankDirect started its negotiations with Standard Funding more than one (1) year before BankDirect and CPFI entered into the Master Transaction Agreement." Pl.'s Compl. ¶ 95(b).  BankDirect has since removed this allegation from its pleading and maintains that while negotiations for Standard Funding's acquisition were taking place during the time of the MTA's negotiation, the former negotiations were between Shockey's investment banking firm and Standard Funding's parent company, New York Community Bank. BankDirect insists that Shockey himself was not personally aware of any negotiations involving Standard Funding at the time the MTA was being negotiated. *See, e.g*., Tr. 226:2-23. For present purposes, it is unnecessary to resolve the issue definitively; the question is only whether BankDirect has offered a sufficient basis for rejecting Capital Premium's fraud claim out of hand. The court concludes that it has not.[8]

---

[8] Capital Premium asserts that its fraud claim is bolstered by the fact that BankDirect has not produced any emails from this period. While BankDirect claims that the emails were inadvertently deleted as a result of a change to its email system, Capital Premium claims that the

BankDirect additionally maintains that its purchase of Standard Funding cannot support a claim of fraud because such purchases were specifically contemplated by the MTA. Specifically, BankDirect cites § 3.06(c) of the MTA, which provides that "prior to the Option Termination Date, BankDirect or any of its Affiliates [may propose] to acquire [a] business unit or enterprise engaged in commercial insurance premium financing within the premium finance market principally served by CPFI." As Capital Premium points out, however, § 3.06(c) adds that any such acquisition "shall be consistent with the terms and conditions more particularly set forth in the Marketing Collaboration Agreement." *Id.* According to Capital Premium, BankDirect's acquisition of Standard Funding was directly contrary to its obligation to work collaboratively with Capital Premium to market Capital Premium's business. It is true, as BankDirect observes, that the Marketing Collaboration Agreement was never actually executed by the parties. As noted earlier, however, Capital Premium contends that BankDirect rebuffed its attempts to consummate the agreement, and contends that BankDirect's failure to enter into the agreement is itself an example of bad faith on BankDirect's part. *See* CPFI PI Br. 19 n.13, ECF No. 89 ("At the very least if, as BankDirect claims, there never was a Marketing Collaboration Agreement reached between the parties, then BankDirect was in breach of Section 3.06(b), which required the parties to 'in good faith negotiate, complete and enter into a Marketing Collaboration Agreement.'") (quoting MTA § 3.06(b)). Countercl. ¶ 171. Based on the arguments and evidence in the record, the court cannot conclude that § 3.06(b) of the MTA refutes Capital Premium's fraud claim.

---

deletion was deliberate. The court lacks sufficient information to address Capital Premium's allegations on this point (it is not entirely clear, for example, whether at least some of the emails in question can be retrieved from other sources) and thus does not rely on them for purposes of this motion.

Based on the foregoing, the court concludes that Capital Premium has shown a likelihood of success in prevailing on its contention that it did not commit an event of default under the MTA by refusing to pay BankDirect's legal expenses.[9]

## 2. The Loan Purchase Commitment Termination Date

In addition to Capital Premium's putative failure to fulfill its indemnification obligations, BankDirect separately argues that it was entitled to terminate Capital Premium's loan-servicing duties simply because its obligation to continue employing Capital Premium has expired. This argument rests on BankDirect's interpretation of the MTA provision defining the date on which it is no longer required to purchase loans from Capital Premium. Section § 1.01 of the MTA defines the "Loan Purchase Commitment Termination Date as:

> the earlier to occur of (a) the CPFI Asset Purchase Closing Date, (b) the CPFI Purchase 'Transaction Date or (c) the CPFI Loan Purchase and Servicing Extension Date; provided, however, that if by January 4, 2016 (i) CPFI has not designated a CPFI Loan Purchase and Servicing Extension Date or CPFI has elected not to extend the CPFI Loan Purchase Commitment Termination Date, (ii) a CPFI Purchase Transaction is not pending and (iii) BankDirect has notified CPFI pursuant to a Potential Stated Option Exercise Notice that BankDirect does not intend to exercise the Option on the Stated Option Exercise Date, then the CPFI Loan Purchase Commitment Termination Date means January 31, 2016.

MTA § 1.01 at 9.

According to BankDirect, this provision means that, unless Capital Premium designated a Loan Purchase and Servicing Extension Date under clause (c)(i), BankDirect's obligation to purchase loans originated by Capital Premium ended on January 31, 2016. BankDirect contends that if Capital Premium wished to extend the date, it was required to designate a Purchase and Servicing Extension Date by January 4, 2016. It is undisputed that Capital Premium did not do

---

[9] Capital Premium additionally argues that BankDirect is not entitled to indemnification because the amount of its requested fees is unreasonable. Because Capital Premium has prevailed on the basis of its other arguments (at least for purposes of this motion), it is unnecessary to address the reasonableness *vel non* of BankDirect's fee request.

so. As a result, BankDirect concludes, the Loan Purchase Commitment Termination Date was January 31, 2016.

BankDirect goes on to note that under the LPSSA, Capital Premium's right to service loans for BankDirect terminates on the Loan Purchase Commitment Termination Date. *See* LPSSA § 3.01(a), BD's Resp. to PI Mot., Ex. B, ECF No. 147-2 ("Capital Premium Financing, Inc. shall remain as Servicer hereunder until the earlier to occur of the date of termination of Servicer and appointment of a Successor Servicer by Purchaser at any time on or after (i) the occurrence and during the continuance of a Servicing Agreement Default, (ii) the CPFI Asset Purchase Closing Date or (iii) the CPFI Loan Purchase Commitment Termination Date."). It follows, BankDirect maintains, that Capital Premium's right to service loans ended on January 31, 2016. This is true, BankDirect emphasizes, regardless of which party ultimately prevails in this litigation.

This argument is unpersuasive for several reasons. As an initial matter, the court notes that even if it were to accept the argument, it would authorize only BankDirect's termination of Capital Premium's duties as its loan servicer. It would not authorize BankDirect's other May 1 actions (i.e., its seizure of Capital Premium's accounts and $1 million in funds). However, even as to the termination of Capital Premium's servicing duties, the argument fails because it misconstrues the above-quoted definition of the "Loan Purchase Commitment Termination Date." As Capital Premium points out, January 31, 2016 serves as the Loan Purchase Commitment Termination Date (and hence, under the LPSSA, the loan-servicing termination date) only if several conditions are met. Most notably, it obtains only if "BankDirect has notified CPFI … that BankDirect does not intend to exercise the Option on the Stated Option Exercise

Date." MTA § 1.01. It is undisputed, however, that BankDirect notified Capital Premium that it *did* intend to exercise purchase option.[10]

The same is true with respect to BankDirect's contention that Capital Premium was required to provide BankDirect with notice by January 4, 2016 if it wished to extend the Loan Purchase Commitment Extension Date. Section 3.04(b) of the MTA provides:

> If the Potential Stated Option Exercise Notice indicates that BankDirect does not expect to exercise the Option on the Stated Option Exercise Date, then Capital Premium shall provide written notice to BankDirect … on or prior to January 4, 2016 notifying BankDirect of whether and to what date CPFI shall elect to extend the CPFI Loan Purchase Commitment Termination Date and the new amended maturity date of the Loan Purchase, Sale and Servicing Agreement (which extended commitment date and new maturity date shall in any such case not be later than June 1, 2018).

MTA § 3.04(b). Once again, the language of this provision clearly states that Capital Premium must request an extension of the Loan Purchase Commitment Termination Date by January 4, 2016 only if "BankDirect [indicates that it] does not expect to exercise the Option on the Stated Option Exercise Date." Since BankDirect indicated that it intended to exercise the option, nothing in § 3.04(b) required Capital Premium to provide notice by January 4, 2016 of its intent to extend the Loan Purchase Commitment Termination Date.

Thus, the MTA's definition of the Loan Purchase Commitment Termination Date does not authorize BankDirect to terminate Capital Premium's servicing duties.[11]

---

[10] Capital Premium additionally contends that BankDirect has waived any argument based on the Loan Purchase Commitment Termination Date by failing to raise it in its initial response to its motion; and that, notwithstanding anything in the MTA to the contrary, BankDirect's conduct has established an implied contract between the parties giving Capital Premium the right to continue servicing the loans. In light of the foregoing analysis, it is unnecessary to address these further arguments.

[11] This of course does not mean that Capital Premium has the right to service BankDirect's loans in perpetuity. It means only that BankDirect is not entitled to terminate its servicing relationship with Capital Premium during the pendency of this litigation based on the MTA's definition of the Loan Purchase Commitment Termination Date.

## C.    Adequate Remedy at Law & Irreparable Harm[12]

The Seventh Circuit has explained that a showing of irreparable harm requires "more than a mere possibility of harm," but does not "require that the harm actually occur before injunctive relief is warranted." *Whitaker*, 858 F.3d at 1045. "[H]arm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Id*. (quoting *Girl Scouts of Manitou Council*, 549 F.3d at 1089). Similarly, showing the lack of an adequate remedy at law "does not require that [the moving party] demonstrate that the remedy be wholly ineffectual. Rather, [the movant] must demonstrate that any award would be seriously deficient as compared to the harm suffered." *Id*. at 1046 (citation and quotation marks omitted).

Capital Premium argues that each of BankDirect's May 1 actions is likely to cause it irreparable harm. The court discusses each of the May 1 actions in turn.

### 1.  Termination of Capital Premium's Loan-Servicing Duties

Capital Premium claims that if BankDirect is permitted to terminate its loan-servicing duties, Capital Premium will become insolvent. Scott Crowley testified that the money Capital Premium makes from servicing loans for BankDirect represents roughly ninety percent of the company's revenue, and that terminating this source of funds would put it out of business. *See* Tr. at 75:15-23 ("Q. Approximately what percentage – the [servicing] fees that Capital Premium makes above the base rate and gets to keep as revenue, what percentage of Capital Premium's revenue is that? A. In mid 90s. It's by far the bulk of our revenue. Q. What would happen if

---

[12] Because the "irreparable harm" and "adequate remedy at law" requirements are so closely interrelated, the court addresses them together. *See, e.g.*, *Woodard v. Victory Records, Inc.*, No. 11-CV-7594, 2013 WL 5517926, at *3 (N.D. Ill. Oct. 4, 2013) ("The inquiries into the existence of irreparable harm and the availability of an adequate remedy at law often raise similar issues and are frequently conducted in combination with one another.") (citing *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)).

Capital Premium -- to Capital Premium's business if it was denied that revenue stream? A. Its revenue would be done. We wouldn't have any revenue.").

BankDirect contends that Capital Premium's concerns are overblown. According to BankDirect, if it terminates Capital Premium's servicing duties, Capital Premium can simply find another financing source. But Capital Premium asserts that it is unable to obtain an alternative funding source because BankDirect has asserted a lien on all of Capital Premium's loans—including loans Capital Premium might originate through another funding source. As Crowley testified during the hearing:

> Q. And just so we're crystal clear, what are the current impositions that are preventing Capital Premium from [obtaining a different funding source]?
>
> A. Pursuant to the termination notice, our understanding was they were terminating the servicing, but they were specifically not terminating the sourcing part of that agreement.
> ….
>
> THE COURT: So what you understood was that you wouldn't be able to service the loans anymore, but any loans that you got would still have to be sold to BankDirect?
>
> THE WITNESS: That's correct.

Tr. at 136:18-137:19.

Crowley's testimony was largely corroborated by Shockey, who acknowledged the difficulty Capital Premium would face in finding a new financing source under these conditions:

> Q. I asked you if the servicing agreement was terminated and BankDirect took over the servicing, I believe you testified earlier that it's possible that Capital Premium could find another lender to finance its new loans, right?
>
> A. I think the documents suggest that.
>
> Q. Now, you understand that BankDirect has a lien on all of Capital Premium's assets, right?
>
> A. Yes.

Q. And in the event that they began to originate new loans through a new lender, is it your belief that that lien would apply to those new loans that were sold to a new lender?

A. Yes.

Q. Then you understand that it's virtually impossible for them to get a new lender if you're going to continue to have a lien on any loans that they originate?

A. More than likely that would be the case, yes.

Tr. 231:18-232:4.

In light of this evidence, the court concludes that Capital Premium is likely to become insolvent if BankDirect terminates its loan-servicing duties.

## 2. Seizure of Capital Premium's Accounts

Capital Premium also contends that it will be irreparably harmed by BankDirect's seizure of its primary deposit and cash management account at TCB. During the hearing, Crowley testified that this is the account Capital Premium uses to pay its day-to-day expenses, and that without access to the account, Capital Premium is simply unable to pay its bills. Tr. at 63:20-25. Crowley further testified that Capital Premium's reputation in the marketplace would be severely damaged if word got out that any of its checks had been returned. *See, e.g.*, Tr. at 62:8-12. ("A. It's a relatively small industry. And what would have happened is information would have spread out from the retail agents to GAs and to carriers, and vice versa, depending upon who had the check. And so -- and once that news spread, it's -- in our industry that causes our tremendous concern.").

BankDirect points out that, to date, none of Capital Premium's checks has actually bounced, and it emphasizes that, beginning with its initial seizure of the account on May 1, 2017, it has worked with Capital Premium to ensure that Capital Premium has the funds necessary to

cover its expenses. *See* Ex. H, BD's Post-Hr'g Resp. Br. Gentry Decl., ECF No. 153-8. As explained above, BankDirect is informed by Capital Premium on a daily basis of the amount of funds it needs, and BankDirect releases the funds to Capital Premium. *Id*. ¶¶ 4-5. Stephen Gentry, BankDirect's CFO, has submitted a declaration stating that "BankDirect has committed to CPFI that, provided BankDirect receives the Daily Funding Report Request from CPFI by approximately 7:30 AM central time each morning, and the request is for amounts associated with reasonable business purposes consistent with the Transaction Facility Documents, BankDirect will initiate the wire requested to go to the CPFI Funding Account by 11:30 AM central time." *Id*. ¶ 6.

For several reasons, Gentry's representations do not preclude a finding of irreparable harm. For one thing, BankDirect's agreement to continue releasing funds is subject to the condition that Capital Premium's "request is for amounts associated with reasonable business purposes consistent with the Transaction Facility Documents." *Id*. ¶ 6. Given the vagueness of the expression "reasonable business purposes," BankDirect retains substantial room for rejecting Capital Premium's requests for funds. In addition, Gentry's declaration does not unequivocally state that BankDirect will continue the current arrangement through the end of the litigation. On the contrary, Gentry assumes that the parties' relationship will be wound down within a couple of months.[13]

Capital Premium contends that it will suffer similar harm if BankDirect is permitted to freeze its Participation Interest Account. As discussed above, the Participation Interest Account maintains the funds that Capital Premium receives from participants in its AFP Program.

---

[13] Gentry's declaration was originally submitted as an exhibit to BankDirect's prehearing brief, and was executed in May 2017. As a result, its representations are dated. For example, the declaration envisioned that the servicing of BankDirect's loans would be transferred from Capital Premium to BankDirect by the end of June 2017. *See* Gentry Decl. ¶ 10.

According to Capital Premium, the AFP is an important marketing tool: it strengthens Capital

Premium's relationships with retail insurance agencies by allowing them to co-fund Capital

Premium's loan portfolio. BankDirect's seizure of the Participation Interest Account effectively

means that Capital Premium is no longer able to deposit money into it or withdraw funds from it.

According to Capital Premium, BankDirect's freezing of the account would leave it unable to

repay AFP participants seeking to withdraw their funds from the program (which participants are

allowed to do at any time). Crowley avers that this would cause irreparable damage to Capital

Premium's reputation. He states, for example, that "in the thirty years that Capital Premium has

operated the APP Program, a participant has never had an issue getting cash out of the program.

Even one APP Program participant being unable to get its funds will have a catastrophic effect

on Capital Premium's business, destroying confidence in the AFP Program." Crowley Decl. ¶ 6,

CPFI PI Mot. Ex. E, ECF No. 89-5.

BankDirect asserts that it has not appropriated any of the funds in the Participation

Interest Account, and that, as with the primary deposit account, it will "continue to accommodate

CPFl's requests to make payouts to and accept deposits from AFP Program Participants in the

normal course of business." Gentry Decl. ¶ 9. Once again, however, the duration of BankDirect's

commitment is indeterminate, and is subject BankDirect's assessment of whether Capital

Premium is engaging in "normal and consistent … activity." *Id*. Thus, BankDirect's assurances

are insufficient to eliminate concerns about the harm resulting from its seizure of the account.

Thus, the court concludes that BankDirect's seizure of Capital Premium's accounts is

likely to prevent Capital Premium's ability to conduct business on a daily basis and to cause

significant damage to the goodwill it has built within the insurance premium finance industry.

### 3. Seizure of Capital Premium's Funds

Finally, Capital Premium argues that BankDirect's seizure of its funds will push it into insolvency. Crowley testified that while BankDirect's seizure of $1 million from Capital Premium's deposit account did not result in insolvency, the company would be rendered insolvent if BankDirect were to take the additional $5 million to which it claims entitlement. *See* Tr. at 67:9-21. BankDirect tersely asserts that Capital Premium has between $16 and $17 million in other deposit accounts. *See* BD PH Br. 19. However, the account in question appears to be the Participation Interest Account, which BankDirect has also seized. *See* Tr. at 123-24. BankDirect has stated that it has no plans to seize any portion of the additional $5 million. *See* Gentry Decl. ¶ 10. Notably, however, its representation on this point was contingent on Capital Premium's cooperation with "BankDirect in its efforts to facilitate a smooth transition" of its loan servicing, and on Capital Premium not committing any further events of default. *Id*. ¶ 10.

In short, Capital Premium has presented evidence that it is likely to become insolvent and to suffer significant damage to its goodwill if BankDirect is permitted to take the May 1 actions. Both insolvency and damage to goodwill are irreparable harms for which there is no legal remedy. *See, e.g.*, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages. Additionally, although economic loss generally will not sustain an injunction, this court [has] stated … that a damages remedy may be inadequate if it comes 'too late to save plaintiff's business.'" (citation omitted) (quoting *Roland Mach. Co. v. Dresser Indus., Inc*., 749 F.2d 380, 386 (7th Cir. 1984)); *Menominee Rubber Co. v. Gould, Inc*., 657 F.2d 164, 167 (7th Cir. 1981) ("The loss of goodwill and the disruption of MRC's business resulting from its termination is substantial and sufficient to constitute 'irreparable harm.'"); *Monfardini v. Quinlan*, No. 02 C 4284, 2003 WL 21384642, at *3 (N.D.

Ill. June 13, 2003) ("One exception to the general rule that the availability of money damages at the conclusion of trial will make the plaintiff whole is the insolvency exception. A defendant's potential or actual insolvency is a 'standard ground' for demonstrating that an award of damages is inadequate.") (citing *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 596 (7th Cir. 1985)); *Visiting Nurses Ass'n of Sw. Indiana, Inc. v. Shalala*, No. IP 99-1560-C H/G, 1999 WL 1059721, at \*7 (S.D. Ind. Sept. 13, 1999) ("Although monetary issues usually are not sufficient to show irreparable harm, the evidence of threatened insolvency is clear enough in this case to satisfy plaintiffs' burden on this element of their motion for a preliminary injunction.") (Hamilton, J.) (citing *Roland Machinery Co. v. Dresser Industries, Inc*., 749 F.2d 380, 386 (7th Cir. 1984)).

The court concludes that Capital Premium has presented sufficient evidence that it is likely to suffer irreparable harm for which there is no adequate remedy at law if BankDirect is not enjoined from taking the May 1 actions.[14]

## D.     Balance of Harms

Because Capital Premium has presented evidence establishing a likelihood of success on the merits, and that it will suffer irreparable harm for which there is no legal remedy absent an injunction, the court moves to the second stage of the inquiry, balancing the irreparable harm to Capital Premium against any irreparable harm to BankDirect, and any effect that entry of the injunction would have on the public interest. The only harm BankDirect has identified is the fact

---

[14] BankDirect's only remaining argument is that the harms at issue cannot be deemed "irreparable" because they are self-inflicted. *See* BankDirect Post-Hrn'g Br. 17-18 (citing *Stuller, Inc. v. Steak N. Shake Ent*., Inc., 695 F. 3d 676, 679 (7th Cir. 2012); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003)). According to BankDirect, the threats Capital Premium now faces could have been avoided if Capital Premium had executed the APA or paid the legal fees BankDirect has demanded. The court finds no merit in this argument. It presupposes that Capital Premium was indeed obligated to perform this actions, which is the very question at issue in this suit.

that if the injunction is granted, it will be forced to continue funding Capital Premium's loans and paying Capital Premium to service the loans. This burden is not insignificant, particularly given the further deterioration of the parties' relationship over the course of the litigation. At the same time, the burden is mitigated by the fact that, as noted above, the arrangement has been lucrative for BankDirect (as well as Capital Premium). The court has been given no reason to think that this will change during the pendency of this litigation. The court thus concludes that the balance of the harms weighs in Capital Premium's favor. Likewise, the court concludes that the public interest, to the extent that it is implicated at all in this case, does not outweigh the harm to Capital Premium.

### III. CONCLUSION

For the reasons discussed above, Capital Premium's motion for a preliminary injunction [ECF No. 89] is granted. Accordingly, BankDirect is preliminarily enjoined from terminating Capital Premium as the servicer of loans that Capital Premium originates; interfering with Capital Premium's control of its deposit accounts; interfering with Capital Premium's access to its Participation Interest; retaining the $1,000,000 it seized from Capital Premium's account on May 1, 2017; and seizing any additional funds from Capital Premium's accounts, including any portion of the $5,000,000 that BankDirect has demanded.

Date:   November 29, 2017

_____/s/_____
Joan B. Gottschall
United States District Judge