**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BANKDIRECT CAPITAL FINANCE, LLC, | ) | |
| | ) | Case No. 1:15-cv-10340 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| vs. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| CAPITAL PREMIUM FINANCING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| CAPITAL PREMIUM FINANCING, INC., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BANKDIRECT CAPITAL FINANCE, LLC; BANKDIRECT CAPITAL FINANCE, a division of Texas Capital Bank National Association; and TEXAS CAPITAL BANK NATIONAL ASSOCIATION, | ) ) ) ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**DEFENDANT CAPITAL PREMIUM FINANCING, INC.'S
MEMORANDUM IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS**

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................. 2

I.     THE MOST CRITICAL DOCUMENTS IN THIS CASE ARE FROM LATE 2010
       TO LATE-2011.................................................................................................... 2

II.    BANKDIRECT'S DESTRUCTION OF EVIDENCE FROM LATE 2010 TO
       LATE-2011........................................................................................................... 3

       A.     Capital Premium Identifies A Substantial Gap In BankDirect's Production.......... 3

       B.     In Response, BankDirect Takes Actions Designed To End This Litigation
              By Destroying Capital Premium. ...................................................................... 5

       C.     The Testimony of BankDirect's Corporate Representative Exposes That
              After BankDirect Filed Its Complaint, It Deleted A Year's Worth of Key
              Emails. ............................................................................................................. 7

       D.     The Testimony of Mr. Shockey Confirms That Responsive Documents
              From Prior to November 2011 Were Ingested Into BankDirect's Email
              Archive. ............................................................................................................ 8

ARGUMENT ..................................................................................................................... 10

I.     THIS COURT SHOULD IMPOSE A DEFAULT JUDGMENT OR ADVERSE
       INFERENCE TO REMEDY BANKDIRECT'S BAD FAITH DESTRUCTION OF
       CRITICAL EVIDENCE. ....................................................................................... 10

       A.     BankDirect Had A Duty To Preserve Documents And Breached That Duty
              By Failing To Take Reasonable Steps To Preserve Evidence. ........................... 12

       B.     BankDirect and TCB Intended To Deprive Capital Premium Of This
              Evidence. ......................................................................................................... 12

              1.     BankDirect's and TCB's Utter Failure To Comply With Basic
                     Preservation Steps Demonstrates They Intended To Destroy
                     Relevant Documents. .............................................................................. 13

              2.     BankDirect's and TCB's Actions After Discovering The
                     Destruction of Evidence Confirm Their Intent To Avoid Detection
                     Of The Deletions. ................................................................................... 17

       C.     Capital Premium Was Harmed By This Breach. ............................................... 20

              1.     Capital Premium's Fraud Claim. ............................................................. 20

i

**Page**

       2.    Capital Premium's Claim For Breach Of The Duty Of Good Faith
And Fair Dealing ................................................................................... 20

       3.    The Parties' Competing Claims For Breach Of The MTA ...................... 21

    D.    Capital Premium Is Entitled To A Default Judgment Or Adverse Inference
Against BankDirect and TCB. ............................................................................. 21

CONCLUSION ................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**CASES**

*Botell v. United States*,
   2013 WL 1178226 (E.D. Cal. Mar. 20, 2013), *report and recommendation adopted
   as modified*, 2013 WL 2106033 (E.D. Cal. May 14, 2013) ..................................................... 13

*Buonauro v. City of Berwyn*,
   2011 WL 3754820 (N.D. Ill. Aug. 25, 2011) ........................................................................ 25

*DaimlerChrysler Motors v. Bill Davis Racing, Inc.*,
   2005 WL 3502172 (E.D. Mich. Dec. 22, 2005) ..................................................................... 16

*Domanus v. Lewicki*,
   742 F.3d 290 (7th Cir. 2014) .................................................................................................. 11

*Glob. Material Techs. Inc. v. Dazheng Metal Fibre Co. Ltd.*,
   2016 WL 4765689 (N.D. Ill. Sept. 13, 2016) ......................................................... 11, 21, 25

*Harkabi v. SanDisk Corp.*,
   275 F.R.D. 414 (S.D.N.Y. 2010) ........................................................................................... 15

*In re Text Messaging Antitrust Litig.*,
   46 F. Supp. 3d 788 (N.D. Ill. 2014), *aff'd* 782 F.3d 867 (7th Cir. 2015) ................................ 11

*Jones v. Bremen High Sch. Dist. 228*,
   2010 WL 2106640 (N.D. Ill. May 25, 2010) ......................................................................... 10

*Long v. Steepro*,
   213 F.3d 983 (7th Cir. 2000) .................................................................................................. 18

*MacNeil Auto. Prod. Ltd. v. Cannon Auto. Ltd.*,
   No. 08 C 139, 2010 WL 5904124 (N.D. Ill. Nov. 2, 2010), *report and recommendation
   adopted as modified,* 2011 WL 812140 (N.D. Ill. Mar. 1, 2011) ........................................... 15

*Marrocco v. Gen. Motors Corp.*,
   966 F.2d 220 (7th Cir. 1992) .................................................................................................. 20

*Montoya v. Orange Cty. Sheriff's Dep't*,
   2013 WL 6705992 (C.D. Cal. Dec. 18, 2013) ....................................................................... 13

*Nacco Materials Handling Grp., Inc. v. Lilly Co.*,
   278 F.R.D. 395 (W.D. Tenn. 2011) ........................................................................................ 12

*Pillay v. Millard Refrigerated Servs., Inc.*,
   2013 WL 2251727 (N.D. Ill. May 22, 2013) ............................................................ 12, 15, 18

*REP MCR Realty, L.L.C. v. Lynch*,
   363 F. Supp. 2d 984 (N.D. Ill. 2005), *aff'd,* 200 F. App'x 592 (7th Cir. 2006) ...................... 26

*United States v. Alejandro*,
   118 F.3d 1518 (11th Cir. 1997) .............................................................................................. 21

**Page(s)**

*Weitzman v. Maywood, Melrose Park, Broadview School District 89*,
    2014 WL 4269074 (N.D. Ill. Aug. 29, 2014) ........................................................ 11, 12, 15, 24

*YCB Int'l, Inc. v. UCF Trading Co.*,
    2012 WL 3069683 (N.D. Ill. June 12, 2012), *report and recommendation adopted*,
    2012 WL 3069526 (N.D. Ill. July 25, 2012).......................................................................... 18

**OTHER AUTHORITIES**

Advisory Committee Notes to Rule 37(e)(2).................................................................. 11

**RULES**

Federal Rules Civil Procedure 37(e)(2) .................................................................. 10, 22

This case presents a stunning example of malfeasance in discovery by BankDirect Capital Finance, LLC ("BankDirect") and Texas Capital Bank ("TCB"). BankDirect, TCB, and their counsel failed to take the most basic step of ceasing the automatic deletion of emails from BankDirect's archive server for almost a year after filing their Complaint. As a result of this failure, a years' worth of emails, covering the most crucial time frame with respect to Capital Premium's defenses and counterclaims, were irretrievably deleted and are now unavailable in this litigation.

The actions of BankDirect, TCB, and their counsel since these deletions were exposed completely destroys any claim that these deletions occurred as a result of a good-faith error. By their own telling, BankDirect and TCB learned of these automatic deletions in November 2016. They said nothing to Capital Premium and took no steps to address the deletions for half-a-year after discovering this substantial destruction of evidence. Then, when Capital Premium identified the lack of emails from the crucial period and sought an explanation, counsel for BankDirect and TCB provided a demonstrably false explanation for the gaps in BankDirect and TCB's production. As Capital Premium moved towards depositions that would expose the falsity of this explanation, BankDirect and TCB launched their May 1st Assault, seeking to destroy Capital Premium's business, end this litigation, and forever conceal their spoliation. The record unequivocally establishes that BankDirect and TCB breached their duty to preserve in an effort to hide evidence and then took steps to cover up this effort. Accordingly, Capital Premium is entitled to a default judgment or, at the very least, an adverse inference on its fraud claim and its claim for breach of the MTA.

**FACTUAL BACKGROUND**

I.    **THE MOST CRITICAL DOCUMENTS IN THIS CASE ARE FROM LATE 2010 TO LATE-2011.**

This case stems from a contractual dispute arising from a series of contracts that Capital Premium and BankDirect entered into in December 2010. These contracts included the primary governing document—the Master Transaction Agreement ("MTA"). One of the agreements included in this set of Transaction Documents was an Option Agreement, which, subject to compliance with the other Transaction Documents, purported to grant BankDirect the option to purchase certain of Capital Premium's assets after five years. In the summer of 2015, as BankDirect started to take actions to effectuate the purchase of those assets, Capital Premium resisted noting many of the crucial ways that BankDirect had failed to live up to its end of the bargain. Specifically, the MTA required that, within 90 days following the execution of the MTA, *i.e*, by the end of March 2011, the parties would negotiate and execute a marketing collaboration agreement, which would govern the arrangement between the parties in terms of marketing each other's products, particularly with respect to BankDirect marketing Capital Premium's products in the eastern United States. Despite the plain provisions of the MTA, that Capital Premium sent several detailed versions of the marketing collaboration agreement to BankDirect that were approved by BankDirect senior management, and that BankDirect permitted Capital Premium to train BankDirect's sales personnel on the protocols outlined in that agreement, BankDirect now claims the parties never reached any agreement on the terms of the marketing collaboration agreement. Capital Premium claims they did reach such an agreement and that BankDirect breached that agreement. Thus, one of the key issues in this case is whether BankDirect negotiated the marketing collaboration agreement in good faith in the first months of 2011 and whether the parties reached a meeting of the minds on such an agreement.

2

One of the key elements of the marketing collaboration agreement and the MTA generally was that BankDirect would market Capital Premium's services in the eastern United States. Nonetheless, in June 2011, BankDirect informed Capital Premium that it was purchasing one of Capital Premium's competitors, Standard Funding. Standard Funding catered to the same-sized agencies as Capital Premium, and largely operated in the eastern United States, where BankDirect was expected to advance Capital Premium's products in certain mid to small markets. In its initial Complaint, BankDirect affirmatively alleged that it had begun negotiations to purchase Standard Funding a year before the closing of the MTA (BankDirect has since removed this allegation). In other words, at or around the time of the closing of the MTA (late 2010 and early 2011) and notwithstanding the provisions of the MTA dealing with the marketing collaboration agreement, BankDirect was in negotiations to purchase another company to fill the precise market in which it had promised to market Capital Premium's products. Thus, evidence related to the Standard Funding negotiations and acquisition from late 2010 through the middle of 2011 is central to the parties' dispute.

## II.     BANKDIRECT'S DESTRUCTION OF EVIDENCE FROM LATE 2010 TO LATE-2011.

### A.     Capital Premium Identifies A Substantial Gap In BankDirect's Production.

In November 2015, BankDirect filed this lawsuit against Capital Premium. Although the parties spent several months engaging in settlement negotiations, in March 2017, the parties completed their initial substantial production of documents. Immediately, Capital Premium recognized that BankDirect's production contained no electronic emails[1] from the crucial time period: fall 2010 through November 2011. To be sure, the MTA and related transaction documents

---

[1]     BankDirect produced a small number of hard-copy print outs of emails from prior to 2011.

were negotiated in mid- to late-2010 and executed in December 2010. Similarly, the MTA required the parties to negotiate and execute the marketing collaboration agreement within 90 days of the execution of the MTA, and the parties exchanged a detailed term sheet to that effect in February 2011. And, finally, BankDirect completed the Standard Funding acquisition in mid-2011. In short, the bulk of the relevant conduct related to Capital Premium's claims and defenses in this case took place in late 2010 through the middle of 2011.

Nonetheless, BankDirect's document production contained no electronic emails dating from that period.[2] As a result, Capital Premium immediately reached out to BankDirect seeking an explanation for the lack of emails from this crucial period. (Ex. 1, 3/22/17 C. McGushin Ltr. to D. Williams (identifying examples of key, responsive documents produced by Capital Premium but not BankDirect)).

In its response, BankDirect stated that the emails from this time period had not been produced because BankDirect changed email archive servers in November 2011, and therefore no longer had possession of any emails from prior to November 2011: "We confirmed that the BankDirect emails collected date back only to November 21, 2011 because in 2011 a new email archive system was installed. ***The e-emails that pre-dated the installation were not retained on the new email archive system***." (Ex. 2, 3/29/17 D. Strubbe Ltr. to C. McGushin (emphasis added).) This revelation was stunning on a number of levels, not the least of which is that BankDirect never told Capital Premium about this critical gap in its production prior to late March 2017 (in the letter cited above).

---

[2] On November 30, 2017, BankDirect made an additional production. This production contained some electronic communications from this time period, but all such communications appear to be collected from other sources such as BankDirect's counsel, investment bankers, and personal email accounts. But, by definition, these communications are limited to communications with third parties or communications for which BankDirect employees used personal email. These sources cannot replace the ***internal*** BankDirect emails that were deleted.

In response, Capital Premium immediately requested that BankDirect take all possible steps to produce these documents, including to "collect these documents from its old archive system, backup tapes, or any other available source." (Ex. 3, 4/3/17 C. McGushin Ltr. to D. Strubbe.) BankDirect's next response doubled-down on its explanation that the "change in archive systems in 2011" was responsible for the absence of pre-November 2011 emails. (Ex. 4, 4/6/17 D. Strubbe Ltr. to C. McGushin.) Further, BankDirect represented that these deletions were irreversible, as the documents could not be recovered in any way. (*Id.* at ("The reference in my previous letters with respect to diligently working with our third-party vendor was to determine if the pre-November 2011 emails could be recovered in any way. The answer is that they cannot.").)

Following this exchange of letters, the parties met and conferred with respect to the lack of pre-November 2011 emails, among other issues. During this call, which occurred on April 10, 2017, counsel for Capital Premium made clear that, given the importance of these pre-November 2011 documents, it would engage in further discovery to determine the circumstances of their deletion and to investigate any possibility of recovery. (Ex. 5, 4/11/17 C. McGushin Ltr. to D. Strubbe (recounting meet and confer).) In an effort to streamline this process, BankDirect agreed to produce a sworn declaration from an employee with knowledge of these facts. BankDirect never provided such a declaration, nor provided further information in response to Capital Premium's April 11th letter.

**B.** **In Response, BankDirect Takes Actions Designed To End This Litigation By Destroying Capital Premium.**

Instead, on May 1, 2017, BankDirect took several drastic actions that were targeted at putting an end to this litigation and concealing its spoliation forever by effectively running Capital Premium out of business. These actions formed the basis for Capital Premium's Motion for a Temporary Restraining Order and Preliminary Injunction, which this Court recently granted. (*E.g.,*

5

Dkt. No. 89.) The timing of BankDirect's May 1st Assault was eyebrow-raising. Since November 2015, despite the ongoing litigation, the parties had for nearly eighteen months continued their business relationship without interruption. Even after the parties reached an impasse on a negotiated asset purchase agreement during the summer of 2016, the parties continued to operate normally, to the benefit of both parties, even as they "geared up" in litigation. None of that changed prior to BankDirect's May 1st Assault.[3]

As it had promised in its April 11th letter, on May 5, 2017, Capital Premium served a notice for the deposition of a corporate representative of BankDirect to cover a number of topics related to the missing documents, as well as BankDirect's procedures for preserving, collecting, and producing documents generally. (Ex. 6, 5/5/17 Deposition Notice.) This deposition was originally noticed for May 19, 2017. BankDirect ignored the notice until May 16th, when it informed Capital Premium that it would not produce a witness on the 19th. (Ex. 7, 5/17/17 C. McGushin Email to D. Williams *et al.* (recounting phone conversation from previous day).) In subsequent conversations, BankDirect stated that no single witness could cover all of the noticed topics, and therefore the parties agreed that BankDirect would put up one witness first, with the parties continuing the deposition with respect to the remaining topics at a later date. Following this agreement, and despite multiple emails from Capital Premium, BankDirect waited ***another month*** to identify its witness or provide potential dates. (Ex. 7, 6/23/17 T. Knapp. Email to D. Strubbe; 6/27/17 D. Strubbe Email to T. Knapp.) And the dates that BankDirect provided were not until late July 2017. (*Id.*)

---

[3]   BankDirect's purported reasoning for launching the May 1st Assault when it did—that it was concerned about the size of Capital Premium's AFP Program and Capital Premium's ability to pay back the AFP Program Participants—was highly specious given that BankDirect had full visibility into the AFP Program since the inception of the parties' relationship in 2010 and had never raised any objection to the Program for six and a half years.

C.   **The Testimony of BankDirect's Corporate Representative Exposes That After BankDirect Filed Its Complaint, It Deleted A Year's Worth of Key Emails.**

The first portion of the corporate representative deposition finally occurred on July 25, 2017.  The testimony of Eric Fisch, BankDirect's corporate representative, made one key point very clear:  the loss of pre-November 2011 emails ***was not*** caused by the change in emails archive systems as BankDirect had claimed.  Instead, at the time that BankDirect filed this litigation, emails dating back to November 2010 were present on BankDirect's archive system.  But, because BankDirect waited a ***year*** after filing suit to put an end to its automatic deletion program, emails dated between November 2010 and November 2011 have been irretrievably lost.

Mr. Fisch, an employee of Texas Capital Bank ("TCB"), testified extensively about the change in email archive systems that occurred at BankDirect and TCB.  Specifically, although that process began in 2011, the new email archive system was not installed at BankDirect until summer of 2012.  (Ex. 8, 7/25/17 E. Fisch Dep. Tr. at 30:4–31:8.)  When this transfer occurred, all of the emails that then existed in BankDirect employees' email were "ingested" (*i.e.* transferred) into the new archive system.  (*Id*. at 57:4–12.)  This ingestion included any emails in a BankDirect custodian's inbox, sent folder, or any other folders except for the "deleted items" folder.  (*Id*. at 56:17-57:3.)  Once ingested into the new email archive system, all emails were saved for five years from the date of the email.  (*Id*. at 59:1-11.)  Thus, if a BankDirect employee sent an email in August of 2010 and the email was ingested into the new archive system, that email would remain on the email archive system until at least August of 2015, and indefinitely if BankDirect suspended its automatic 5-year deletion program.  After the new archive system was installed, even if that BankDirect employee manually deleted the email prior to August 2015, the email would remain on the archive system for at least the five year period.  (*Id*. at 60:10–16.)

To lay it out most plainly, if in July 2012 (when the email archive transfer occurred at BankDirect), a BankDirect employee had any emails anywhere in her email system other than the deleted folder (*i.e.*, inbox, sent mail, or a subject matter folder), all of those emails would have been transferred into the new email archive system.   Once such emails were transferred into the new system, they ***could not*** be deleted except for when they were automatically deleted five years after the date of the email.

Mr. Fisch also testified about BankDirect's actions in ceasing this automatic deletion of emails in this litigation.   Specifically, Mr. Fisch confirmed that BankDirect and TCB ***failed to cease the automatic deletion of emails until October or November 2016—a year after BankDirect filed this litigation, and eleven months after TCB was added as a party in Capital Premium's counter-claims***.   (*Id*. at 60:7–61:19.)   Because BankDirect did not suspend the automatic deletion program until a year after filing this lawsuit, all emails from prior to November 2011 have been irretrievably lost and are now unavailable in this litigation.  (*Id*. at 59:16–18 ("Q: There's no possible way to get -- to recover the e-mail?  A:  No there is not.").)  Critically, however, if BankDirect had suspended its automatic deletion program in November 2015 when it filed this lawsuit, as it was duty-bound to do, emails between November 2010 and November 2011 would still be accessible today.  (*Id*. at 76:3–18.)

### D.    The Testimony of Mr. Shockey Confirms That Responsive Documents From Prior to November 2011 Were Ingested Into BankDirect's Email Archive.

Following the deposition of Mr. Fisch, Capital Premium sought to continue the deposition of BankDirect's corporate representative on the remaining topics, on which Mr. Fisch was not prepared.  BankDirect eventually identified Joseph Shockey, BankDirect's President and CEO, as its second witness.  But BankDirect took the position that this deposition, which dealt with foundational discovery issues, nonetheless should not occur until Mr. Shockey's personal

deposition, which would not occur for months. Over BankDirect's objection, Magistrate Judge Cole ordered that Mr. Shockey be produced prior to September 20, 2017. (Dkt. Nos. 130, 138.)

During this deposition, Mr. Shockey testified that he was personally responsible for putting in place a litigation hold and assuring that relevant documents were maintained. (Ex. 9, 9/19/17 J. Shockey Dep. Tr. at 31:18–32:1.) Crucially, Mr. Shockey confirmed that he and everyone else at BankDirect and TCB failed to order the suspension of the automatic deletion of archived emails until at least October of 2016, nearly a year after BankDirect filed suit. (*Id*. at 16:19–24.) BankDirect did not inform Capital Premium upon discovering this failure. Instead, it sat silent for nearly half a year, waiting for Capital Premium to discover the issue, and then, as discussed in detail below, misled Capital Premium about the reason it did not have any pre-November 2011 emails.

Mr. Shockey also testified concerning his personal email habits prior to the email archive change in July 2012. Mr. Shockey confirmed that he maintained a separate folder for communications related to Capital Premium, and that this folder would have contained all the communications related to the BankDirect-Capital Premium relationship as of July 2012. (*Id*. at 49:14-17 ("Q: In July of 2012, you would have had all of your Capital Premium-related e-mails stored in a Capital Premium folder, right? A: I believe so, yes. Q. Okay. And so you don't have any reason to think that those e-mails would not have been ingested into the archive system, right? A. If they were in the ingested box, if you will, that would be correct.").) No doubt knowing this Motion by Capital Premium was coming and hoping to perfect their prior claim that no pre-November 2011 emails were ingested into the new email archive system, counsel for BankDirect attempted to neuter this testimony on re-direct, only for Mr. Shockey to again unambiguously confirm that his general practice was to "clean[] up" his inbox by moving specific emails into

folders, and "[o]nce I've moved it to a folder, it's generally retained there indefinitely unless there was -- I don't know of any reason why I would delete it at that time." (*Id.* at 72:9-21.) In short, there is no question that, prior to the change in the email archive system, Mr. Shockey (the most crucial BankDirect witness in this case) managed his email folders in such a way that emails related to Capital Premium would have been present in a specific folder in 2012 when BankDirect installed its new archive system. Thus, Mr. Shockey's email (and the email of every other BankDirect custodian who did not have a routine practice of immediately deleting all sent and received email) was ingested into the new email archive system and would still be available for use in this litigation but for BankDirect and TCB's failure to put in place a litigation hold until nearly a year after filing their Complaint.

## **ARGUMENT**

### I.   **THIS COURT SHOULD IMPOSE A DEFAULT JUDGMENT OR ADVERSE INFERENCE TO REMEDY BANKDIRECT'S BAD FAITH DESTRUCTION OF CRITICAL EVIDENCE.**

To impose sanctions for spoliation, the Court must find: 1) that there was a duty to preserve the specific documents and/or evidence; 2) that the duty was breached; 3) that the other party was harmed by the breach; and 4) that the breach was caused by the breaching party's willfulness, bad faith, or fault. *Jones v. Bremen High Sch. Dist. 228*, 2010 WL 2106640, at *5–6 (N.D. Ill. May 25, 2010). Under the recent amendments to the Federal Rules of Civil Procedure, the most serious sanctions, such as entering a default judgment or an adverse inference, require a finding that "the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). However, this new language has not modified the standard within the Seventh Circuit. *See, e.g.*, *Glob. Material Techs. Inc. v. Dazheng Metal Fibre Co. Ltd.*, 2016 WL 4765689,

at *3 (N.D. Ill. Sept. 13, 2016) (citing Seventh Circuit case law under prior Rule 37 language).[4] Indeed, even prior to the change in rules, courts in the Seventh Circuit recognized that, in order to support a severe sanction, "bad faith is required" and "bad faith means 'destruction for the purpose of hiding adverse information.'" *Weitzman v. Maywood, Melrose Park, Broadview School District 89*, 2014 WL 4269074, at *2 (N.D. Ill. Aug. 29, 2014); *In re Text Messaging Antitrust Litig.*, 46 F. Supp. 3d 788, 797 (N.D. Ill. 2014), *aff'd* 782 F.3d 867 (7th Cir. 2015) ("[T]o obtain an inference that missing evidence as adverse to the opposing party, a party claiming spoliation must show that the party intentionally destroyed the documents in bad faith. Evidence is to be considered to have been destroyed in bad faith if it is destroyed for the purpose of hiding adverse information." (internal citations and quotation marks omitted)). Although, as recounted further below, the conduct of BankDirect was clearly intentional, courts in the Seventh Circuit have recognized that this standard for severe sanctions is also satisfied by reckless conduct. *See also*, *Pillay v. Millard Refrigerated Servs., Inc.*, 2013 WL 2251727, at *3 (N.D. Ill. May 22, 2013) (recognizing that to warrant a severe sanction like an adverse inference, moving party must show "bad faith, which is akin to conduct that is intentional or reckless. A document is destroyed in bad faith if done with the purpose hiding adverse information").

And, critically, Courts in the Seventh Circuit have held that the sort of conduct here, failure to suspend the automatic deletion of emails, satisfies this standard. *See, e.g.*, *Weitzman* 2014 WL 4269074, at *3 ("[F]ailure to suspend normal document destruction policies . . . was a bad faith breach of [defendant's] discovery obligations").

---

[4]     As the 2015 Advisory Committee Notes to the amended Rule 37 language makes clear, the change was aimed at modifying case law from other circuits that had permitted the granting of an adverse inference based only upon a finding of negligence or gross negligence. *See* Advisory Committee Notes to Rule 37(e)(2) ("Negligent or even grossly negligent behavior does not logically support that [adverse] inference."). Even prior to the amendment, courts in the Seventh Circuit generally required a higher showing of "willfulness, bad faith, or fault." *E.g.*, *Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014).

**A.** **BankDirect Had A Duty To Preserve Documents And Breached That Duty By Failing To Take Reasonable Steps To Preserve Evidence.**

There can be no dispute about the first two elements. At the latest, BankDirect and TCB had a duty to preserve documents as of November 2015, when BankDirect filed this litigation. *See Weitzman*, 2014 WL 4269074, at *3. BankDirect and TCB breached that obligation by not suspending their automatic email destruction until a year later, in November 2016. *Id.* This failure to suspend the automatic deletion combined with BankDirect's failure to issue a written litigation hold directly caused the deletion of all BankDirect email pre-dating November 2011. *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 404 (W.D. Tenn. 2011) ("In summary, after the duty to preserve was triggered, Lilly failed to timely issue an effective written litigation hold, to take appropriate steps to preserve any existing electronic records, to suspend or alter automatic delete features and routine overwriting features, and to timely and effectively collect ESI. Therefore, the court finds that Lilly breached its duty to preserve relevant evidence."); *Botell v. United States*, 2013 WL 1178226, at *5 (E.D. Cal. Mar. 20, 2013), *report and recommendation adopted as modified*, 2013 WL 2106033 (E.D. Cal. May 14, 2013) (finding willful and material breach of preservation duty based, in part, on defendant's failure "to administer litigation hold notices and to suspend its practice of automatically deleting emails after thirty days"); *Montoya v. Orange Cty. Sheriff's Dep't*, 2013 WL 6705992, at *9 (C.D. Cal. Dec. 18, 2013) (finding breach of duty to preserve where defendant failed "to suspend its 2-year automatic deletion of ESI").

**B.** **BankDirect and TCB Intended To Deprive Capital Premium Of This Evidence.**

BankDirect will no doubt argue that the deletion of these documents was the result of either a good faith mistake or simple negligence. But this claim is impossible to square with the facts, particularly BankDirect's repeated efforts to conceal their spoliation after Capital Premium discovered the issue. BankDirect and TCB (1) failed to comply with even the most basic duties

with respect to preserving evidence; (2) failed to disclose this serious issue or take any steps to remedy the issue when they claim to have first discovered it; (3) repeatedly misrepresented the reason for the deletions when confronted by Capital Premium; and (4) took other aggressive steps to avoid the production of responsive documents, terminate this litigation, and conceal their spoliation.

> **1.** **BankDirect's and TCB's Utter Failure To Comply With Basic Preservation Steps Demonstrates They Intended To Destroy Relevant Documents.**

*First*, the egregiousness of BankDirect and TCB's failure is difficult to overstate. This is not a circumstance where some individual, isolated, or far flung source of responsive documents was inadvertently overlooked. BankDirect and TCB failed to put a stop to the ***only*** mechanism that could delete electronic communications. (Ex. 8, 7/25/17 E. Fisch Dep. Tr. at 60:10–16 ("Q: Is there any way that an e-mail that's ingested in the archiving system can be removed from the archiving system other than through the five-year roll off? A: No. Q: What about if it's manually deleted? A: There's no way.").) It is not an overstatement to say that BankDirect and TCB failed to do the ***one thing*** they needed to do to assure an effective litigation hold with respect to the key electronic communications in this case.

Even taking at face value Mr. Shockey's testimony that he "thought . . . that all the e-mails were retained for a seven-year period," (Ex. 9, 9/19/17 J. Shockey Dep. Tr. at 23:16–19.), others at BankDirect and TCB, particularly in the IT department (which served both TCB and BankDirect) and legal department, obviously were aware of the 5-year automatic deletion program. TCB, ***a named party in this case***, is a sophisticated publicly-traded bank and familiar with the steps needed to preserve relevant evidence, including the issuance of a litigation hold to suspend the automatic deletion of email. (Ex. 8, 7/25/17 E. Fisch Dep. Tr. at 98:8–14 ("Q: [D]oes Texas Capital Bank normally issue litigation holds to individual custodians that may be involved

in litigation?  A:  The one I have seen, yes.  I don't know if I have seen every one but I have seen those come across my desk.").)  What's more, in late 2015 and 2016, BankDirect and TCB were represented by sophisticated outside counsel (both Williams, Bax & Saltzman and Bracewell LLP) who were certainly aware that the issuance of a "written litigation hold" is a "widely-recognized" and necessary step to preserve data.  *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 419 (S.D.N.Y. 2010).  These outside firms have longstanding relationships with BankDirect and TCB; it is simply not credible to believe that ***none*** of these attorneys had any knowledge of the manner in which BankDirect and TCB documents were preserved and when they were automatically deleted.  The only reasonable conclusion is that TCB and BankDirect, along with its outside counsel, knew of the automatic deletion policy and decided not to suspend it for a year after filing suit.

That nobody in the legal department, IT department, or any other department of TCB or BankDirect took the most basic step to stop the deletion of critical emails for nearly a year after filing suit is direct evidence of bad faith, particularly where the fraud claim in Capital Premium's complaint put internal documents of BankDirect directly at issue.  *See Weitzman*, 2014 WL 4269074, at *3 ("District 89's failure to suspend normal document destruction policies, for closed session board meetings, was a ***bad faith*** breach of its discovery obligations." (emphasis added)); *Pillay*, 2013 WL 2251727, at *3 ("There is no evidence that he took any action to intercept the automatic deletion of relevant evidence.  As such, recklessness and ***bad faith*** are permissible inferences." (emphasis added)); *MacNeil Auto. Prod. Ltd. v. Cannon Auto. Ltd.*, No. 08 C 139, 2010 WL 5904124, at *6 (N.D. Ill. Nov. 2, 2010), *report and recommendation adopted as modified,* 2011 WL 812140 (N.D. Ill. Mar. 1, 2011) (finding party acted in bad faith despite claim that destruction occurred pursuant to routine business decision).  *See also*, *DaimlerChrysler Motors v. Bill Davis Racing, Inc.*, 2005 WL 3502172, at *1 (E.D. Mich. Dec. 22, 2005) ("Such

14

normal procedures for destruction of documents must, however, be suspended when a party is on notice that they may be relevant to litigation, and the failure to make an adequate search of such documents before their destruction may be evidence of ***bad faith***." (emphasis added)).  The Court simply cannot reward this sort of intentional disregard for preservation duties.

In addition, BankDirect repeated attempts to conceal its custodians' personal emails is additional strong evidence of BankDirect and TCB's intent to deprive Capital Premium of these documents.  During the course of reviewing the correspondence between BankDirect and Capital Premium, Capital Premium identified a number of instances of BankDirect employees using personal email accounts for purposes of business correspondence.  (Ex. 3, 4/3/17 C. McGushin Ltr. to D. Strubbe.)  Particularly given the other apparent gaps in BankDirect's production, Capital Premium sought to confirm that BankDirect would collect emails from the personal email accounts of its custodians.  (*Id*.)  Once again, BankDirect's counsel sought to brush aside this concern (after purportedly looking into the issue) by saying that "[i]t is our understanding that BankDirect employees did not use personal email addresses as a matter of practice."  (Ex. 4, 4/6/17 D. Strubbe Ltr. to C. McGushin.)  BankDirect thus refused to collect the personal emails, despite Capital Premium's identification of instances of these accounts being used for business purposes.

Following the pattern of the spoliation issue, the deposition of Mr. Shockey exposed BankDirect's position as either completely uninformed or deliberately misleading.  Mr. Shockey testified that he regularly used his personal email account for business purposes, including that he regularly forwarded work emails to his personal account, (Ex. 9, 9/19/17 J. Shockey Dep. Tr. at 12:12–18 ("Q:  Did you have a habit or a regular practice of forwarding e-mails from your BankDirect e-mail to your Comcast e-mail back in the 2010 or 2011 time period?  A:  I forwarded e-mails to myself for a long time mainly because of the convenience of being able to access it.")),

15

and that "the higher-up people [at BankDirect] tend to do that from time to time." (*Id*. at 55:4–5.) In short, Mr. Shockey's testimony is completely inconsistent with BankDirect's prior claim that BankDirect employees did not regularly use their personal emails for BankDirect business. Now that the issue has been exposed, BankDirect finally has agreed to collect and produce emails from these accounts.

If BankDirect and TCB's deletion of emails were in fact inadvertent, the only logical response would be for these parties and their counsel to immediately attempt to find any other source of these deleted documents. And it turns out that the primary potential source is the personal emails of their custodians. But not only did BankDirect and TCB initially fail to take this step and collect the emails, they ***affirmatively refused*** to conduct such a search and claimed (falsely) that BankDirect custodians did not conduct business on their personal email accounts. Once again, the only conclusion that can be drawn is that BankDirect and TCB intended to prevent these documents from being produced.

Finally, even if the Court assumed that nobody at BankDirect or TCB knew about their own document retention and deletion policy, the facts still establish that BankDirect and TCB were recklessly indifferent to their discovery duties, which courts in this Circuit have found sufficient for a finding of intent. *Pillay*, 2013 WL 2251727, at \*3 (recognizing that to warrant a severe sanction like an adverse inference, moving party must show "bad faith, which is akin to conduct that is intentional or reckless"); *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) ("[W]illfulness and bad faith are associated with conduct that is intentional or reckless."); *YCB Int'l, Inc. v. UCF Trading Co*., 2012 WL 3069683, at \*10 (N.D. Ill. June 12, 2012), *report and recommendation adopted*, 2012 WL 3069526 (N.D. Ill. July 25, 2012) (same). Even under the most charitable interpretation, BankDirect's and TCB's conduct was reckless. The best view of the facts for

16

BankDirect and TCB is that they, despite having in-house counsel (at TCB) and sophisticated outside counsel, decided to place the entirety of their document preservation efforts in the hands of a non-attorney, Mr. Shockey. Moreover, if the Court believes that these attorneys were unaware of the automatic deletion policy, this would mean that, in addition to leaving Mr. Shockey in charge of the preservation efforts, these many attorneys took *no* steps to learn anything about their clients' document retention policies. If they had done so, they would have quickly learned about the automatic deletion policy. Thus, even under the best view of the facts for TCB and BankDirect, they were reckless in their preservation and collection efforts and should be subject to a severe sanction.

### 2. BankDirect's and TCB's Actions After Discovering The Destruction of Evidence Confirm Their Intent To Avoid Detection Of The Deletions.

BankDirect's and TCB's efforts to conceal their destruction of evidence after Capital Premium started to investigate this issue confirm that BankDirect's destruction of evidence was *not* the result of an innocent mistake: this was an intentional effort to destroy relevant evidence and then cover it up after the fact.

Even taking the testimony of Mr. Shockey at face value, BankDirect and its counsel learned of the deletion of critical emails in October or November 2016 when they finally suspended the automatic deletion of email. (Ex. 9, 9/19/17 J. Shockey Dep. Tr. at 23:23-24:3; *id*. at 32:17-33:3.) When BankDirect, TCB, and their counsel learned of this issue, they had to know it was a major problem given that the deleted emails cover the most critical time period in this case.

Yet, neither BankDirect nor its counsel took any steps to inform Capital Premium of the issue so the parties could discuss potential remedies. Nearly half a year later, when Capital Premium finally discovered the issue as a result of its own investigation, BankDirect misled Capital Premium about the reason it did not produce any electronic emails from prior to November

17

2011. Rather than confirming that these documents had been permanently deleted as a result of a failure to issue a litigation hold, counsel for BankDirect and TCB falsely claimed that the emails produced "date back only to November 21, 2011 because in 2011 a new email archive system was installed. ***The emails that pre-date the installation were not retained on the new email archive system.***" (Ex. 2, 3/29/17 D. Strubbe Ltr to C. McGushin (emphasis added).)

This explanation contains two materials falsehoods designed to conceal the spoliation: (1) the email archive system change did not occur at BankDirect until ***July 2012*** (Ex. 8, E. Fisch Dep. Tr. at 31:4–8 ("Q: And do you know generally when BankDirect employees' e-mails were put into the Symantec e-mail archiving system? A: That would have been ingested in July 2012.")); and (2) emails that pre-dated the installation ***were*** retained on the new email archive system. (*Id*. at 56:17–57:12 (testifying that all e-mails in the active email folders were ingested) *and id*. at 56:2–7 (testifying that PST files were ingested). To be clear, when BankDirect's counsel wrote this response, it ***knew*** that the five-year automatic deletion had only been suspended in November 2016 and therefore ***knew*** that this was the reason that no emails were produced from prior to November 2011. Nonetheless, BankDirect's counsel misled Capital Premium by framing the deletion as the result of a technical change.

Then, when Capital Premium took steps to further uncover the scope of the deletions, BankDirect and its counsel took steps to frustrate this discovery, by delaying for months in producing an initial witness, and then by arguing that the second portion of this deposition should not occur until virtually the end of discovery. (Dkt. No. 130 (Capital Premium's motion to compel continuing deposition).) While also seeking to frustrate this discovery, BankDirect launched the May 1st Assault aimed at destroying Capital Premium's business, ending this litigation, and

forever concealing the spoliation.[5]  Any argument that the deletions were a result of a good faith mistake is destroyed by these post-deletion actions.  That BankDirect, TCB, and their counsel would make such aggressively misleading statements to Capital Premium is strong circumstantial evidence of their intent to keep these documents from ever being produced.

The Seventh Circuit has recognized that this sort of conduct and concealment **after** the loss of evidence supports a finding of bad faith.  *See Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (imposing sanctions based, in part, on the "uncontested finding that Goodyear stood idly for months before it attempted to investigate the [evidence's] apparent loss; it waited even longer before informing the plaintiffs that the [evidence] was missing"); *see also Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co*., 2016 WL 4765689, at *9 (N.D. Ill. Sept. 13, 2016) ("Their dishonesty leads me to conclude that, when defendants discarded one source of electronic evidence and failed to preserve others, they did so deliberately and in order to prevent GMT from obtaining that evidence and using it against defendants in the litigation.").  Here, BankDirect's conduct is even more egregious than in *Marrocco* and equally as egregious as in *Global Materials*; not only did it sit idly by for months, it affirmatively misled Capital Premium[6] and then tried to end the litigation and conceal its spoliation forever by forcing Capital Premium into submission.  Given BankDirect's conduct both before and after the deletions occurred, there

---

[5]    Similarly, BankDirect waited nearly a year after learning of this issue (until September 2017) to reach out to other third parties that may have possession of some of the since-deleted documents.  To be sure, taking this step could not have fully cured the issue given that many of the most important communications would have been internal BankDirect emails, which, by definition, would not include a third party from which the communications could be recovered.

[6]    Courts routinely recognize in the criminal context that a "false exculpatory statement," like that provided by BankDirect, is circumstantial evidence of guilt.  *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997) ("The defendant's testimony denying guilt, if disbelieved by the jury, can be evidence that the opposite is true and can establish the elements of the offense.  This rule has 'special force' where the highly subjective elements, such as intent, are to be proved." (citations omitted).)

is substantial evidence that it specifically intended to deprive Capital Premium of these documents or, at the very least, acted with reckless disregard for its duty to preserve documents.

### C. Capital Premium Was Harmed By This Breach.[7]

Capital Premium was harmed because it is now deprived of the most critical evidence from the most critical time period in the case on several of its claims. As recounted below, the deleted documents make up the most important documents for several of the claims at issue in this litigation.

#### 1. Capital Premium's Fraud Claim.

With respect to BankDirect's fraud claim, the most relevant documents to establishing the intent of BankDirect will be *internal* communications, as those communications alone would shed objective, contemporaneous light on BankDirect's motivations at and around the time the transaction closed in December 2010. For instance, any discussions within BankDirect about whether it intended to acquire another entity in the same space as Capital Premium (such as Standard Funding) or whether it intended to move forward with the marketing collaboration agreement as required by the MTA are the most important documents for this claim. All such documents are irretrievably lost.

#### 2. Capital Premium's Claim For Breach Of The Duty Of Good Faith And Fair Dealing.

Similarly, the thrust of Capital Premium's claim for breach of the duty of good faith and fair dealing is that BankDirect robbed Capital Premium of a valuable part of Capital Premium's consideration in the transaction by refusing to comply with its obligation to enter into and abide

---

[7] Although Capital Premium is not required to show prejudice for the entry of the most significant sanctions under the amended Rule 37(e), the harm to Capital Premium is certainly indicative of BankDirect's motivation for deleting these documents.

by a marketing collaboration agreement and by purchasing Standard Funding. Once again, the primary objective evidence of BankDirect's motivations around this time—contemporaneous internal emails—is now lost.

### 3.     The Parties' Competing Claims For Breach Of The MTA.

The deleted documents are further relevant to Capital Premium's claims for breach of the MTA. Capital Premium's breach claims relate to BankDirect's refusal to negotiate in good faith, execute, and abide by the marketing collaboration agreement. BankDirect's internal communications during the negotiation period for the marketing collaboration agreement, which took place in early 2011, are crucial to establishing whether BankDirect was negotiating in "good faith" as required by the MTA, or simply seeking to string Capital Premium along.

In addition to Capital Premium's affirmative claims, the lost documents are also relevant to BankDirect's affirmative claims against Capital Premium. The primary claim of breach that BankDirect advances against Capital Premium is based on Capital Premium's refusal to execute the Asset Purchase Agreement ("APA") that BankDirect provided to Capital Premium in February 2016. Capital Premium's primary reason for refusing to execute this version of the APA is that it did not comply with the required form APA that was attached to the MTA. Determining whether the proposed changes to the APA are in line with the parties' intent at the time the MTA was executed will again require reference to the internal documents of BankDirect surrounding the time of execution of the MTA. But, again, all internal BankDirect emails from this time period are now gone.

### D.     Capital Premium Is Entitled To A Default Judgment Or Adverse Inference Against BankDirect and TCB.

For all of these reasons, Capital Premium is entitled to a default judgment on the claims identified above (BankDirect's Claim II for breach of contract; Capital Premium's Claim II for

breach of contract; Claim IV for breach of the covenant of good faith and fair dealing; and Claim VI for fraud in the inducement). The record establishes that BankDirect, TCB, and their counsel intended to deprive Capital Premium of this crucial evidence by (1) allowing the documents to be deleted, (2) attempting to cover up the deletions by misrepresenting the circumstances of their deletion, (3) launching the May 1st Assault in an effort to end this litigation, and (4) delaying for months any efforts to find these documents from other sources. This sort of bad-faith, intentional behavior is grounds for a default judgment. Fed. R. Civ. P. 37(e).

At the very least, Capital Premium is entitled to an adverse inference that the deleted documents would have been unfavorable to BankDirect and TCB. Courts in this circuit have imposed such sanctions upon similar facts. For instance, in *Weitzman*, a series of recordings were deleted pursuant to an automatic deletion policy. 2014 WL 4269074, at *1. The Court recognized that the failure to suspend document destruction policies "leading to the destruction of relevant material is evidence of bad faith." *Id*. at *3 (collecting cases). Further, in *Weitzman*, the court reasoned that the "continued failure to preserve several recordings cannot" be "construed as something less than bad faith." *Id*. Given that the school district in *Weitzman* knew that here would be a "fight coming," the court found it "highly unlikely that probative items of evidence, as potentially important as the [recordings], were unknowingly or innocently deleted." *Id*. at *4. The Court thus granted the motion for an adverse inference.

The same analysis, in even stronger terms, applies here. BankDirect knew the crucial nature of these early communications, but continued to delete them for ***an entire year***. To believe BankDirect's "innocent" explanation, the Court would have to believe that ***nobody*** from BankDirect or TCB, nor anybody from BankDirect and TCB's outside counsel, knew about or even made a single inquiry about the process for preserving documents. This supposed innocent

explanation is not credible, particularly in light of BankDirect's efforts to mislead Capital Premium and conceal the spoliation after the fact and BankDirect and TCB's lack of effort to take any steps to remediate the destruction of this evidence.  Given this overwhelming evidence of wrongdoing, an even stronger remedy is called for than in *Weitzman*.

Likewise, in *Buonauro v. City of Berwyn*, a governmental entity again deleted recordings of meetings pursuant to an automatic deletion policy.  2011 WL 3754820, at *10 (N.D. Ill. Aug. 25, 2011).  The government argued that its deletions were performed pursuant to an automatic deletion policy, and thus were not done in bad faith.  *Id*. at *10–11.  The court found this argument undercut by the fact that "the City did not destroy only one tape in accordance with its ordinary policy but acted at least four separate times to erase tapes for" four separate meetings.  *Id*. at *11. Further, the government in the case could not "provide a reasonable basis" for its actions.  *Id*. at *12.  The court found an adverse inference instruction appropriate given the circumstances.  *Id*. at *12–13.  Here, BankDirect's conduct is more egregious, as it deleted emails pursuant to an automatic deletion policy on approximately fifty different occasions (as the deletions occurred every weekend), an order of magnitude more than the four times in *Buonauro*.  (Ex. 8, 7/25/17 E. Fisch Dep. Tr. at 57:24–58:1 ("The actual removal of e-mail occurs on a weekend.").)

Here, in addition to the failure to institute an effective litigation hold and prevent the deletion of documents that this case shared with *Buonauro* and *Weitzman*, there is also the evidence of the repeated false statements by counsel for TCB and BankDirect in an effort to cover up these deletions.  Courts have routinely recognized that such repeated false statements are evidence of bad faith and intent to destroy documents.  *See, e.g., Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co*., 2016 WL 4765689, at *9-10 (N.D. Ill. Sept. 13, 2016) ("Defendants were not merely dilatory or misleading by omission in their litigation tactics; they were affirmatively deceitful, to

23

GMT and to the court.").  These misstatements make BankDirect and TCB's conduct here even *more* egregious, and thus the most severe sanction is appropriate.  And where, as here, the spoliation goes to the most critical evidence to prove a claim, "any lesser sanction . . . would unfairly minimize the seriousness of the misconduct and fail to deter sufficiently such misconduct by others in the future."  *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 990 (N.D. Ill. 2005), *aff'd,* 200 F. App'x 592 (7th Cir. 2006).

**<u>CONCLUSION</u>**

For these reasons, Capital Premium respectfully requests that the Court enter a default judgment in Capital Premium's favor on BankDirect's Claim II, and Capital Premium's Claims II, IV, and VI.

Submitted:  December 6, 2017

*/s/ Justin Barker*
Justin A. Barker (IL 6274518)
jbarker@kirkland.com
Timothy Knapp (IL 6300232)
timothy.knapp@kirkland.com
Casey McGushin (IL 6313465)
casey.mcgushin@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: 312-862-2000
Fax: 312-862-2200

*Attorneys for Defendant Capital Premium Financing, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that, on January 16, 2018, a true and correct copy of **DEFENDANT CAPITAL PREMIUM FINANCING, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS** was served on all parties having made appearances in this matter via the Court's ECF Notification System.

/s/ *Justin Barker*
*An attorney for Defendant Capital Premium Financing, Inc.*