# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BANKDIRECT CAPITAL FINANCE, LLC | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 10340 |
| | ) | |
| v. | ) | |
| | ) | |
| CAPITAL PREMIUM FINANCING, INC., | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

BankDirect, which is a diversified financial services company, which, from its inception, has conducted business nationally with well-established insurance agencies, [Dkt. #28 at 12], has sued Capital Premium Financing, Inc. under an Option Agreement and related Master Transaction Agreement. The Third Amended Complaint spans 75 pages and 270 paragraphs. [Dkt.#160]. While the parties' labyrinthine undertakings are, in many ways, typical of modern corporate transactions, at bottom the Third Amended Complaint alleges a breach of contract.[1] Insisting that the Defendant has done nothing wrong, the Answer raised 12 "Affirmative Defenses," and its 226-paragraph "Supplemented Counterclaims" charge BankDirect with "willful and bad faith breaches of [the] Master Transaction Agreement and related agreements...."

---

[1] This is not in any way to minimize the importance of contracts. Indeed, "[c]ontracts mark the progress of communities in civilization and prosperity... They seek to give stability to the present and certainty to the future. They gauge the confidence of man in the truthfulness and integrity of his fellowman...Without them, society could not go on." *Farrington v. Tennessee*, 95 U.S. 679, 682 (1877).

At the heart of the Defendant's claim of wrongdoing is the contention that the Plaintiff had falsely represented during contract negotiations that it would exclusively market and promote the Defendant's loan products – an allegation denied by the Plaintiff – especially in the Eastern United States to small to midsize insurance agencies, and that as a consequence it was contemplated that the Defendant's sales and earnings during the five-year term of the contract would be substantially and positively affected. The Counterclaim charges that, instead, the Plaintiff purchased Standard Funding, "a direct competitor" of the Defendant[2] and failed to market and promote the Defendant's loan products as it allegedly had promised. Here is a sampling of the relevant allegations in the Counterclaim:

> 197. A key component of the MTA [the contract between the parties] for [Defendant] was the marketing and promotion of its loan products and services by BankDirect's large sales force, throughout the United States, and particularly in the Eastern United States, for small to mid-sized agencies, which would have substantially increased CPFI's sales and earnings during the 5-year MTA period.
>
> 198. BankDirect representatives made several material and misleading representations during negotiations that BankDirect would exclusively market [the defendant's] products for small to midsized agencies throughout the United States, and particularly in the Eastern United States.
>
> 199. Prior to entering into the [Agreements with Defendant], BankDirect was negotiating the acquisition of Standard Funding, a direct competitor of CPFI.
>
> 200. BankDirect subsequently acquired Standard Funding shortly after the MTA and Option Agreement were executed.
>
> 201. Thereafter, BankDirect marketed and promoted its own products in the Eastern United States to the exclusion of marketing CPFI's products.
>
> 209. CPFI reasonably relied on BankDirect's promises concerning the exclusivity of

---

[2] The Complaint alleged that Standard Funding was a direct competitor of the *Plaintiff.* Resolution of that disputed question is obviously an appropriate matter for discovery. Request 33 did not seek to resolve that question.

the marketing in the small to mid-sized agency market segment. (Emphasis added).

(Dkt. #172, at 114-115).

It is against this background of charges and countercharges that the present discovery controversy arose. In Request 33, the Defendant demanded that the Plaintiff produce:

> "Documents sufficient to determine the proportion of BankDirect's loan volume that is attributable to the 150 largest insurance agencies in the United States from 2010 to present."[3]

Although the contract at issue was signed in 2016, the Request sought documents dating back to 2010.

Who would decide what documents would be "sufficient" to show the proportion of the Plaintiff's loan volume attributable to the 150 largest insurance agencies in the United States over an 8 year period and what would they consist of. In the first instance, of course, it would be the Plaintiff. Potentially, extensive billing and other records for every agency will have to be reviewed and a very large number produced. Remember, the Request does not seek a number; it seeks documents "sufficient" to enable the calculation. Perhaps the Defendant would say the documents that have been produced are insufficient, in which event there will be further wrangling. What seems likely, however, is that the disclosure of documents responsive to Request 33 will reveal those

---

[3] For example, assume the loan volume from the "top 150 agencies" (assuming they could be identified) was $20 million. Further assume that the Plaintiff's loan volume from other agencies was $10 million. In this example, the proportion of loan volume derived from the top 150 agencies would be two thirds. (Of course the figures in this example are arbitrary and are not intended to correspond to the actual facts).

The 150 figure was employed because the Defendant alleged that BankDirect primarily focused its relationships with the 150 largest insurance agencies in the United States. BankDirect denied this allegation, stating that it is a "diversified financial services company that conducts business nationally with well-established insurance agencies, regardless of size." (Dkt. #28 at ¶ 23).

agencies with which the Plaintiff is doing business and the volume of business each is doing, Yet, the Defendant has not claimed it is entitled to see such documents, and it is likely they are not entitled to learn customer identities or billing practices. But that issue has not been discussed by the Plaintiff , and so we move on. *Aker v. Americollect, Inc.*, 854 F.3d 397, 399 (7th Cir. 2017).

BankDirect objected to the Request:

> BankDirect's *relationship* with the 150 largest insurance agencies in the United States, *and* the proportion of BankDirect's business attributable to these agencies, is not in any way related to any claim, counterclaim, defense or other factual dispute in this litigation. As such, Request No.33 constitutes nothing more than an impermissible and harassing fishing expedition into BankDirect's non-CPFI related business. [Dkt. #209 at 1](Emphasis supplied).

The actual request, as it was quoted in the materials submitted to me, did not ask for documents showing the "relationship" the Plaintiff had with the top 150 agencies in the United States. Rather, it asked for documents "sufficient to show" the proportion that Plaintiff's loan volume attributable to the 150 largest insurance agencies in the United States bore to the Plaintiff's total loan volume.[4] It is Capital Finance's theory that these documents would show the potential for the claimed marketing collaboration agreement. In Capital Finance's words: "Said another way, because BankDirect focused on large agencies, BankDirect's sales force in certain regions could market **Capital Premium's** product to small and mid-sized agencies. Thus, the parties respective market positions directly impact the potential for the marketing collaboration agreement."(Dkt. 209 at 2)(Bold in original).

---

[4] Had the Request sought documents "sufficient to determine" the Plaintiff's "relationship" with the top 150 agencies in the Country it would have been improper for a variety of reasons, not the least of which would have been the unacceptably vague phrasing and obvious overbreadth of the request. Stated another way, the request was irrelevant.

But BankDirect has conceded that "a *significant* portion of its business comes from the top 150 agencies" in the United States." [Dkt. 209, at 9](Emphasis supplied). And, in light of the Defendant's admission in its Counterclaim, there is no argument that the Defendant's business was directed to small and mid-sized agencies. [Dkt. 172 at page 82, ¶21). Thus, the Plaintiff has conceded that it dealt with large players in the market, and there is no issue that the Defendant was not one of those players. In sum, while the Plaintiff insists that the information sought by Request 33 is not relevant, [Dkt. # 209 at 8], there were far more efficient ways of proving the relative size and involvement of the parties than the method chosen by Request 33. But that does not change the fact that it is focused on each individual agency relationship. There is a logical disconnect between the phrase "primarily focused its relationships" and a proportional breakdown of BankDirect's loan volume. [Dkt. #209, at 9].

## ANALYSIS

### A.

Discovery is not a game of "gotcha." *Gordon v. Target Corp.*, 318 F.R.D. 242, 246 (E.D.N.Y. 2016). "[T]he purpose [of] discovery is..."the quest for truth." *Taylor v. Illinois*, 484 U.S. 400, 430 (1988). *See also United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958); *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 2017 WL 3730655, at *3 (N.D. Ill. 2017). Thus, Fed.R.Civ.P. 1 requires that the other rules of civil procedure be interpreted to secure the "just" resolution of civil litigation. By requiring prompt disclosure of relevant information and documents, the discovery provisions of the Federal Rules of Civil Procedure seek to avoid the surprise that is antithetical to the informed determination of cases on their merits. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512-13 (2002).

While the Rules signaled an end to what Wigmore appropriately called trial by ambush, *see, e.g., Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 31 (1st Cir. 2001); *Duracell U.S. Operations, Inc., v. JRS Ventures, Inc.*, 2018 WL 704686, at *4 (N.D. Ill. 2018), they were not intended to be a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest. Were it otherwise, discovery would be measured by the creativity and skill of counsel. It is not. "Parties are entitled to a reasonable opportunity to investigate the facts-and no more." *Vakharia v. Swedish Covenant Hosp.,* 1994 WL 75055 at *2 (N.D.Ill.1994). The core requirement of any discovery request is that the information be relevant. Thus, Rule 26(b)(1), Federal Rules of Civil Procedure, provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." The information sought need not be admissible at trial; it is sufficient if the discovery request "appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. *Accord*, *Redwood v. Dobson*, 476 F.3d 462, 469 (7th Cir.2007); *Northwestern Memorial Hosp. v. Ashcroft,* 362 F.3d 923, 930 (7th Cir. 2004).

While the federal discovery rules have an expansive reach, *Bond v. Utreras,* 585 F.3d 1061, 1075 (7th Cir.2009); *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2017 WL 5890923, at *2 (N.D. Ill. 2017), they are not without limits, and relevancy is perhaps the most important of those constraints. *See Herbert v. Lando,* 441 U.S. 153 (1979); *Hallett v. Morgan,* 296 F.3d 732, 751 (9th Cir.2002); *Uppal v. Rosalind Franklin University of Medicine and Science,* 2015 WL 5026228 (N.D.Ill.2015). Indeed, given the potential for and the all too obvious reality of litigation abuse, *U.S.O. Corp. v. Mizuho Holding Co.,* 547 F.3d 749, 754 (7th Cir. 2008); *ME2 Prods., Inc. v. Does*, 2016 WL 6948333, at *4 (N.D. Ga. 2016), the Supreme Court has cautioned judges to exercise appropriate

control over the discovery process. *Herbert*, 441 U.S. at 177. Failure to do so can result in enormous costs to the litigants and to the due administration of justice. *Cf. Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); Frank Easterbrook, *Discovery as Abuse,* 69 B.U.L.Rev. 635 (1989)..

Not surprisingly, the courts are unanimous in prohibiting discovery from being used as a "fishing expedition[5] – the very thing the Defendant is accused of engaging in. This oft-repeated prohibition is ultimately bound up with the concept of relevancy, which accounts for the prohibition. *Cf. Equal Employment Opportunity Comm'n v. Union Pac. R.R. Co.*, 867 F.3d 843, 852 (7th Cir. 2017) ("[t]he requirement of relevance... is designed to ... prevent 'fishing expeditions.'"). Unless the requestor can demonstrate that the materials sought are relevant, judges should not hesitate to exercise appropriate control over the discovery process. Phrased differently, "fishing expeditions" in discovery are prohibited because the information being sought is ultimately not "relevant." *Cf. In re Dairy Farmers of America, Inc. Cheese Antitrust Litig*., 801 F.3d 758, 766 (7th Cir. 2015); *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1193 (10th Cir. 2009);*E.E.O.C. v. United Airlines*, 287 F.3d 643, 653 (7th Cir. 2002); *Hofer v. Mack Trucks,* inc. 981 F.2d 377, 380 (8th Cir. 1992); *Zamora*, 2017 WL 1861843, at \*6; *Prager v. Campbell City Memorial Hospital.*, 2011 WL 13134916, at \*2 (D. Wyo. 2011).

**B.**

Predictably, the parties take polar positions regarding the relevancy of the requested documents. As we noted earlier, the Defendant insists that BankDirect's position in the marketplace

---

[5]*See, e.g.*, *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009);*Central States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 637 (7th Cir. 2012);*U.S.O. Corp.,*.547 F.3d 749, 754 (7th Cir. 2008)("...indiscriminate and largely unsupervised fishing expeditions ... characterize some American discovery."); *Higgason v. Hanks*, 54 F. App'x 448, 450 (7th Cir. 2002); *Pirazi v. Panda Express, Inc*., 2009 WL 4232693 at \*4 (N.D. Ill 2009)

is relevant to the claimed failure of the parties' "marketing collaboration agreement." [Dkt. #209 at 2]. As alleged by the Defendant, this agreement was intended to provide a framework within which BankDirect and Capital Premium could utilize each other's sales force to expand their business, avoiding conflicts by dividing the market largely by agency size. (Dkt. # 128 at ¶¶ 10–12; 30–33). Thus, the Defendant reasons, the parties' *respective market positions* directly impacted the potential for (and presumably gave rise to) the parties' agreement. That may well be true; but knowing the *exact* proportion of the Plaintiff's loan volume attributable to the top 150 insurance agencies in the United States for an eight year period would not show the parties' respective market positions beyond what the parties essentially knew; nor would it add meaningfully to what the parties have acknowledged were their respective positions in the market.

The Counterclaim alleged that Standard Funding was a "large, direct competitor of [Capital Premium, the Defendant]." (Dkt. # 28 at ¶ 85). BankDirect denied this allegation, claiming that "Standard Funding was a direct competitor of BankDirect, not [Capital Premium]." (*Id*.). Knowing, what proportion of the Plaintiff's loan volume came from its largest 150 insurance agencies in the United States would not show who was a competitor of Standard Funding. Perhaps it might be relevant for the Defendant to be able to show what was expected to result from the acquisition of Standard Funding, *vis-a-vis* what was expected from the contract with the Defendant– if that information were available. But that is not what Request 33 seeks.

BankDirect's response to the allegation that it primarily focused its relationship with the 150 largest insurance agencies in the United States was that it is a diversified financial services company that conducts "business *nationally* with *well-established* insurance agencies, regardless of size...." (Dkt. 28 at ¶ 24) (Emphasis supplied). And BankDirect does not deny that "a *significant portion* of

8

its business comes from the top 150 agencies." (Emphasis supplied). [Dkt. #209 at 9]. It is also conceded that its sales staff consists of 21 persons while the sales staff of the Defendant consisted of 8. [Dkt. #28 at 12]. Obviously, there is really no dispute about the relative financial sizes of the Plaintiff and Defendant, no matter what criteria are employed. Knowing the *exact* proportion of the Plaintiff's loan volume from the top 150 insurance agencies in the United States – which is what Request 33 seeks – would not meaningfully add to that which the Plaintiff has conceded or to the disputed issues in the case.

Moreover, knowing the *exact* proportion of the Plaintiff's loan volume from the top 150 insurance agencies in the country would not meaningfully make more likely that the promises claimed to have been made by the Plaintiff were, in fact, made. In a different factual setting than now exists, perhaps the opposite would be true. But facts count and cannot be ignored. *Upjohn Company v. United States,* 449 U.S. 383, 390 (1981).

Of course, not every piece of evidence has to prove a case; as Professor McCormick put it, "a brick is not a wall." "'[I]ndividual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Huddleston v. United States,* 485 U.S. 681, 691 (1988). Corroborative evidence is important. *Hoskins v. McBride,* 13 Fed.Appx. 365, 368 (7th Cir.2001). But there are other, simpler and more direct ways to prove the parties' respective positions in the marketplace than asking for documents spanning an 8-year period, "sufficient to show" the proportion of the Plaintiff's" loan volume derived from the "top 150 insurance agencies in the United States."

## C.

As with all discovery matters, district courts have extremely broad discretion in deciding motions to compel and in deciding relevancy questions. *Geiger v. Aetna Life Insurance Co.,* 845 F.3d 357, 365 (7th Cir. 2017); *Peals v. Terre Haute Police Dept.,* 535 F.2d 621, 629 (7th Cir. 2008). And they can prescribe the order and sequence otherwise appropriate discovery is to take. They may grant or deny the motion in whole or in part and may fashion a ruling appropriate for and proportional to the circumstances of the case. *Gile v. United Air Lines, Inc.,* 95 F.3d 492, 496 (7th Cir.1996); *Daher v. Sevier*, 2018 WL 627588, at *3 (7th Cir. 2018); Fed. R. Civ. P. 26(d)(3). Exercise of a court's broad discovery authority is reviewable for abuse, *Daher v. Sevier*, _Fed. Appx._, 2018 WL 627588, at *3 (7th Cir. 2018), which occurs "when no reasonable person could take the view of the district court." *United States v. Re,* 401 F.3d 828, 832 (7th Cir.2005). *Accord Paske v. Fitzgerald,* 785 F.3d 977, 983 (5th Cir.2015). "'The very exercise of discretion means that persons exercising discretion may reach different results from exact duplicates.'" *McCluskey v. Kemp*, 753 F.2d 877, 891 (11th Cir. 1985), *aff'd*, 481 U.S. 279, 289-290 (1987). *Accord Mejia v. Cook County*, 650 F.3d 631, 635 (7th Cir. 2011).

The relative positions of the parties in the market can certainly be explored during depositions and in interrogatories, which, under the circumstances of this case, should be undertaken before a party seeks to have produced in discovery what is potentially a massive quantity of information, from which the Plaintiff will first have to figure out the proportion that Request 33 seeks – subject to possible objections from the Defendant that the documents are not *sufficient* to enable a precise determination of what proportion of the Defendant's business was derived from the top 150 insurance agencies in the United States. As it is presently structured, Request 33 is unwieldy, and the ultimate

conclusion that is sought, even if the defendant thinks it critical, can be more easily and readily obtained. Nothing in the discovery rules require a district court to turn a blind eye to questions of proportionality, which inhere in every exercise of discretion under the discovery rules. Rule 26(b)(1) now includes a discussion of proportionality. It states:

> parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and proportional* to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Chief Justice Roberts has stressed that "[t]he key here is careful and realistic assessment of actual need" that may "require the active involvement of...the federal judge to guide decisions respecting the scope of discovery." *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 259 (3rd Cir. 2016). "The instant matter is a prime example of the need for such controlled discovery." *Id.*

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** February 20, 2018

11