## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **BANKDIRECT CAPITAL FINANCE, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 C 10340** |
| | ) | |
| **v.** | ) | **Judge John Lee** |
| | ) | |
| **CAPITAL PREMIUM FINANCING, INC.,** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## INTRODUCTION

### A.

Capital Premium Financing has filed a Motion for Spoliation Sanctions seeking the entry of a default judgment on Count II of BankDirect's Complaint and on Counts II, IV, and VI of Capital's Counterclaim. Alternatively, Capital has asked that the jury be given an adverse inference instruction at trial. [Dkt. #203, 211, 19].[1] Essentially, the claim is that BankDirect has intentionally destroyed (or allowed to be destroyed) several years worth of emails that had been sought in discovery by Capital. BankDirect vigorously insists the nonproduction was the result of a series of "innocent" mistakes, [Dkt. # 211 at 19], and that there was no intent to undermine or adversely affect Capital's case or bolster that of BankDirect or Texas Capital.

28 U.S.C. § 636(b)(1)(B) limits my authority to grant the requested relief, and Judge Lee accordingly has instructed me to issue a report and recommendation – [Dkt. #221] – to which the parties are entitled to *de novo* review. *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856,

---

[1] A review of the filings relevant to the present motion [Dkt. ##203, 211, 220] do not indicate that either of the parties asked for an evidentiary hearing. Instead, they have submitted the matter on the record as it exists, which consists of extensive briefs, largely based on deposition testimony.

869 (7th Cir. 1996).

**B.**

The doctrine of spoliation is one of the most enduring principles of the common law. In essence, it provides that when a litigant, has destroyed, fabricated, or suppressed evidence, the trier of fact may (but need not) draw an inference that the spoliator believes its case is weak or unfounded. The inference can be either permissive or obligatory, and it is often for the jury (although not always) to determine whether the inference will be applied in the particular case before it. The principle has best been described by Dean Wigmore:

> It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that this case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause. 2 Wigmore, Evidence § 278 at 133 (3d Ed.1940) (emphasis supplied).

*See also*, Maguire & Vincent, Admissions Implied From Spoliation or Related Conduct, 45 Yale L.J 226 (1935). *See generally, Lutalo v, National Railroad Passenger Corp.*, 2013 W. L. 1294125 at*5 (D. Colo. 2013).

And so we proceed to the merits on the record the parties have submitted, recognizing the critical role facts always play, *Upjohn Company v. United States,* 449 U.S. 383, 390 (1981); *Sandra T.E. v. South Berwyn School Dist*. 100, 600 F.3d 612, 619 (7th Cir.2010), and mindful that reasonable inferences based on those facts are permissible. *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995). Facts, not "general propositions ... decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905)(Holmes, J., dissenting). We are also guided by the

2

overarching principle that common sense and experience always have a role to play in drawing inferences and must not be ignored. *See, e.g., United States v Montoya De Hernandez*, 473 U.S. 531, 542 (1985); *Barclay v. Florida*, 469 U.S. 939, 950 (1983);*Germanowski v. Harris*, 854 F.3d 68, 75 (1st Cir. 2017); *Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 971 (7th Cir. 2001)("Categorical judgments based on experience and common sense play an important role in all areas of law.").

Finally, my assessment of the parties' contentions was guided by the accepted principle that a combination of events, each of which seems mundane when viewed in isolation, may present a very different picture when considered together. *See Ryburn v. Huff,* 565 U.S. 469 (2012); *Miller v. Alabama,* 567 U.S. 460 (2012); *Castle v. Billiard*, 64 U.S. 172, 187 (1859); *United States v. Rodriguez*, 975 F.2d 404 (7th Cir.1992). Or in Cardozo's inimitable phrasing: "If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous." *In re Elm St. in City of New York,* 246 N.Y. 72, 158 N.E. 24 (1927).

While it is often true that credibility determinations are difficult to make on a cold record, *United States v. Raddatz*, 447 U.S. 667, 679 (1980); *Jackson v. United States*, 859 F.3d 495, 498 (7th Cir. 2017); *N.L.R.B. v. Mickey's Linen & Towel Supply, Inc.*, 460 F.3d 840, 842 (7th Cir. 2006), they are not impossible. *See, e.g., United States v. Jones*, 315 F. App'x 714, 716 (10th Cir. 2009). And where, as here, determinations are based on a wealth of deposition testimony, an evidentiary hearing is not required. Indeed, such a hearing would be largely duplicative of what has already occurred, where the witnesses already have given extensive sworn testimony and have been subjected to intense cross-examination – what Wigmore has called "the greatest legal engine ever invented for

3

the discovery of truth." *Lilly v. Virginia*, 527 U.S. 116, 124 (1999). There is no need for that testimony to be repeated, and the parties have had more than ample opportunity to brief the issues involved in the spoliation motion. Indeed, their briefs total 72 pages, with hundreds of pages of exhibits, consisting largely of deposition transcripts. And, finally, the parties have been represented by enormously talented and experienced counsel. No more is required.

## ANALYSIS

### A.

BankDirect, 90% of which is owned by Texas Capital Bank, formally initiated this litigation on November 16, 2015 by way of a complicated, 149-paragraph, 38-page Complaint, which asked for declaratory, monetary and injunctive relief. The Complaint alleged that BankDirect and Capital entered into a marketing collaboration agreement in 2011 and that Capital breached the agreement. Capital's Answer claimed that although BankDirect was to market Capital's services in the eastern United States, BankDirect purchased Standard Funding in June 2011 – a company Capital claims is *its* competitor, and which catered to the same-sized agencies as Capital and largely operated in the eastern United States. For Capital, this shows that BankDirect negotiated the marketing collaboration agreement in bad faith and that the Plaintiff was simultaneously negotiating a purchase agreement with Standard Funding that would be detrimental to Capital's interests. *See generally BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc*., 2018 WL 946396 (N.D. Ill. 2018).

The plaintiff was represented by a Firm made up of experienced and accomplished counsel, with an important, nationwide clientele.[2]  It is at least a reasonable assumption that for some time

---

[2] According to information appearing on the Firm's website, at the time of the Complaint's filing, the three lawyers whose names appeared on the Complaint had been in practice for a total of 50 years. The
continue...

4

prior to the mid-November 2015 filing of the Complaint the attorneys for BankDirect had been actively involved in the review and acquisition of evidence necessary to support their theory of the case, as Rule 11, Federal Rules of Civil Procedure required. The same assumption of involvement would apply to Texas Capital Bank, which not only owned 90% of BankDirect, but was sued *in this case* by Capital as counter-defendant a month after BankDirect filed its Complaint. [Dkt. #11]. That Texas Capital was intimately involved in the case from the beginning may be inferred from the fact that when it was sued in this case in December 2015 by Capital, it had and continues to have the *same lawyers* who were representing BankDirect in the litigation. [Dkt. #29]. It is a reasonable inference that plaintiff's highly experienced, talented lawyers would have instructed their clients to immediately put a litigation hold on documents even before the actual filing of the Complaint. *See* cases cited *infra*. Indeed, Mr. Shockey of BankDirect conceded that as of the date on which BankDirect's Complaint was filed in 2015, he and everyone he worked with knew that "they needed to preserve every document, good or bad." [Dkt. #203-11, Shockey Dep. at 31-32].

While a party's failure to issue a litigation hold does not inevitably constitute spoliation, *Jones v. Bremen High School*, 210 WL 2106640 at *9 (N.D.Ill. 2010), it can be part of a mosaic of evidence leading to a finding of spoliation. In short, claimed spoliation necessarily depends upon the often varying facts of the case, and the attempt by BankDirect and Texas Capital to articulate a rule of automatic and unvarying exoneration whenever a litigation hold has not been put in place is

---

[2]...continue
Firm's Managing Partner was the signatory on the Complaint. For purposes of the present motion, the authenticity of that website under Rule 901, Federal Rules of Evidence, is presumed. *See Silversun Indus., Inc. v. PPG Indus., Inc.*, 2017 WL 5127321, at n.5 (N.D. Ill. 2017).

simply mistaken. [Dkt. #211 at 15].[3]

As discovery proceeded, Capital was concerned that BankDirect had produced no emails from the Fall 2010 through November 2011, the period in which the parties were negotiating their Agreement and BankDirect and Standard Funding were negotiating theirs. When Capital called BankDirect on this, BankDirect said that the emails from this time period had not been produced because BankDirect changed servers in November 2011, and therefore it no longer had possession of any emails prior to November 2011. In BankDirect's words, "[t]he emails that pre-dated the installation were not retained on the new email archive system." [(Dkt. #203-4; 3/29/17 D. Strubbe Ltr. to C. McGushin]. As we shall see, that representation was false.

 Not surprisingly, this upset Capital and the parties went back and forth on this for a bit. Finally, on April 6, 2017, BankDirect foreclosed any possibility of collecting the missing electronic emails, writing: "The reference in my previous letters with respect to diligently working with our third-party vendor was to determine if the pre-November 2011 emails could be recovered in any way. The answer is that they cannot. To the extent the [sic] any emails existed in hard copy, they have been produced." [Dkt. #203-6; 3/29/17 D. Strubbe to C. McGushin].

BankDirect bristled at the suggestion that the loss of the pre-November 2011 emails might have been deliberate, claiming that the change in archive server (in late November 2011 through the Summer of 2012) was "years before any party could have foreseen litigation . . . ." [Dkt. #203-6; 3/29/17 D. Strubbe Ltr. to C. McGushin]. Thereafter, on April 10th and 11th, Capital indicated over

---

[3] No court has ever held that failure to issue a litigation hold can have no meaning in a spoliation case. Nor could it. Spoliation requires that the evidence has been put out of reach by some intentional misconduct of the defendant. And failure to put on a litigation hold may well be a component in the overall evidentiary picture.  In short, while it is not dispositive, standing along, it may well have significance when considered with other circumstances.

6

the phone and by letter that it would be seeking testimony from a knowledgeable individual at BankDirect regarding the disposition of the emails and the steps taken to locate them. The parties agreed that a good first step would be a Declaration from a BankDirect employee on this point.  [Dkt. #203-7; 3/29/17 D. Strubbe Ltr. to C. McGushin].  *Oddly, BankDirect never provided any Declaration.*

On May 5, 2017, Capital served a notice for the deposition of a corporate representative of BankDirect to cover a number of topics related to the missing emails, as well as BankDirect's procedures for preserving, collecting, and producing documents generally. [Dkt. #203-8, 5/5/17 Deposition Notice.].[4] The deposition was noticed for May 19, 2017. On May 16th, 11 days after the notice of subpoena and three days before the scheduled deposition, BankDirect informed Capital that it would not produce a witness. BankDirect claimed that no single witness could cover all of the noticed topics. The parties then agreed that BankDirect would put up one witness first, with the parties continuing the deposition with respect to the remaining topics at a later date. [Dkt. #203-9]. It took BankDirect another month to identify its witness or provide potential dates, which took the dispute into late July 2017.  [Dkt. #203-9].

---

[4] Capital presented evidence to Judge Gottschall that, at about this time, BankDirect took a number of actions against it allegedly designed to run it out of business, thereby ending this litigation and, as a result, concealing any spoliation: these actions included terminating Capital's loan-servicing duties, seizing its accounts, and seizing its funds. Judge Gottschall determined that Capital's evidence demonstrated it had a likelihood of success on the merits of these charges and entered a preliminary injunction against BankDirect taking such actions. *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2017 WL 5890924 (N.D. Ill. Nov. 29, 2017).

BankDirect has appealed that order [Dkt. #191], and says that it took the challenged actions because it believes Capital was and is in default of its contractual obligations to BankDirect. As the facts underlying the May 2017 actions are tied inextricably to the merits of this case, consideration and resolution of how those actions might affect this spoliation motion are beyond the authority of a magistrate judge on a referral for a report and recommendation on a discovery sanctions motion.

Eric Fisch, an employee of Texas Capital Bank, which, as we have noted, owns 90% of BankDirect, [Dkt. #203-11, at 30-31], was deposed on July 25, 2017. He testified extensively about the change in email archive systems. While the change began in 2011, the new email archive system was not fully installed at BankDirect until July 2012. [Dkt. #203-10; Fisch Dep. at 30–31]. The transfer covered all of the emails going back five years that then existed in BankDirect employees' folders – i.e., their inbox, sent folders, or any other folders except for the "deleted items" folder. [Dkt. #203-10; Fisch Dep. at 56-58]. Once the migration was complete in July 2012, as emails aged to five years, they would be automatically purged from the system. (Dkt. #203-10; Fisch Dep. at 59-60). The purge occurred every weekend. (Dkt. #203-10; Fisch Dep. at 57).

This meant that emails going back to November 2010 were in existence and obtainable as of November 2015 when the Complaint was filed, contrary to what BankDirect had represented in its March 29, 2017 letter, which incorrectly stated that "[t]he emails that pre-dated the installation [in July 2012] were not retained on the new email archive system." [Dkt. #203-4].

Since, the lawyers for BankDirect, who were also the lawyers for Texas Capital, were involved in the case for some period prior to the filing of the Complaint, the available emails would and should have existed for an even longer period than mid-November 2010. And it bears repeating that Mr. Shockey admitted that at least as of November 2015, when the Complaint was filed, everyone knew that no documents were to be destroyed.

According to Mr. Fisch, if there were emails generated or received during the period of late 2010 through November 2011, they would have been part of the transfer which began in November 2011 and continued to July 2012. And so, at a minimum, emails sent or received during at least the period November 2010 through November 2015 when BankDirect filed suit, should have been

8

available. [Dkt. #203-10; Fisch Dep. at 76]. But, BankDirect claims it innocently did not take the appropriate action for a year and eleven months, even after Texas Capital was added as a party defendant in Capital's counter-claims in December 2015. [Dkt. #203-10; Fisch Dep. at 60–62]. In any event, given the behavior of BankDirect and Texas Capital, recovery of the emails sought by BankDirect is now impossible.

BankDirect identified Joseph Shockey, its President and CEO, as a witness, but refused to produce him until his personal deposition, which was months off. I ordered that the deposition proceed [Dkt. ## 130, 138], which it did on September 20, 2017. Mr. Shockey was an important witness and player in this drama: he admitted he maintained a separate electronic or computerized "folder" for emails regarding Capital, and this folder would have contained all the communications *related* to Capital as of July 2012 when the migration to the new archive was complete. [Dkt. #203-11, Shockey Dep. at 49]. He knew of no reason why he would have deleted them. [Dkt. #203-11, Shockey Dep. at 72].

He said he was personally responsible for putting in place a litigation hold and assuring that relevant documents were maintained. [Dkt. #203-11, Shockey Dep. at 31-32]. Yet, Mr. Shockey claimed that neither he nor anyone else at BankDirect or Texas Capital ordered the suspension of the automatic deletion of archived emails until at least October of 2016, nearly a year *after* BankDirect filed suit! [Dkt. #203-11, Shockey Dep. at 16-17]. By then, of course, he would say that the only relevant emails still in existence would cover the period October 2011 onward. Yet, Capital had sought emails for the period Fall 2010 to November 2011. Mr. Shockey claimed he didn't learn there was an automatic five-year deletion protocol in the system until October of 2016. [Dkt. #203-11, Shockey Dep. at 22-23]. But he was the President of BankDirect, and surely the truth was known to

Texas Capital, which owned 90% of BankDirect. And it was months before BankDirect came clean with Capital regarding the "loss" of all the emails. [Dkt. #203-6].

Still, Mr. Shockey wasn't concerned because, he claimed, "there wouldn't have been any emails that were problematic during that period of time . . . [or that made] him feel uneasy one way or the other." [Dkt. #203-11, Shockey Dep. at 24]. He claimed that BankDirect and Capital had a "happy marriage together, moving forward" and everything they were "doing . . . was all in the positive sense." [Dkt. #203-11, Shockey Dep. at 24]. Thus, he said, there was no reason for him to think there were any bad emails, so their deletion he said wasn't problematic. [Dkt. #203-11, Shockey Dep. at 24]. Of course, "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018).

Although he admitted knowing that "every document" was to be preserved, Mr. Shockey also conceded that, as of November 2015, when BankDirect's Complaint was filed, he and the people he worked with knew that "they needed to preserve every document" good or bad. He said, quite oddly – and unbelievably – that he didn't think that positive emails would come in handy to help prove *BankDirect*'s side of things once litigation began. [Dkt. #203-11, Shockey Dep. at 25]. Nor, apparently, had he thought that "positive" emails would tend to disprove Capital's claims against BankDirect.[5]

This testimony is simply not credible. Or as the court put it in *Irizarry v. Quiros*, 722 F.2d 869, 871 (1st Cir. 1983) "[w]e can only think it naive to think that any court would credit this excuse."

---

[5] In any event, BankDirect's suit strongly suggests that the marriage wasn't all that all that happy.

10

No reasonable, successful businessman would be so naive as to think that prior, positive exchanges of emails with one's present accuser had no capacity to help prove that Capital's charges were baseless and pretextual. [Dkt. #203-11, Shockey Dep. at 24].[6] From this he reasoned that it did not make any difference whether the emails had been retained or destroyed. In evaluating Mr. Shockey's claim, we, of course, ought not abandon common sense, or ignore the realities of life and human experience. The Supreme Court has "made crystal clear that, in assessing the importance of the testimony, it is of utmost importance to be sensitive to the realities of human life and the actions and reactions of real people." *Stephens v. Miller*, 13 F.3d 998, 1021 (7th Cir. 1994). That recognition is consistent with case after case in the federal courts. *See, e.g., Rabin v. Flynn*, 725 F.3d 628, 639 (7th Cir. 2013); *United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011); *United States v. Horne,* 198 Fed.Appx. 865, 871 (11th Cir.2006)*; Dabertin v. HCR Manor Care, Inc.,* 373 F.3d 822, 830 (7th Cir. 2004); *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 743 (1st Cir. 1995)*; Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 16 (1st Cir.1989).

BankDirect, of course, has an array of excuses for the destruction of emails. First, it claims that it "is unlikely that emails from 2010 and early 2011 remained in an inbox more than a year later when the transfer occurred." [Dkt. #211, at 2]. The emails, as BankDirect would have it, "were more likely deleted in the ordinary course in 2010 or 2011 and never even transferred to the new email system . . . ." [Dkt. #211, at 2]. There is not a bit of evidence to support the claim. Remember Mr. Shockey had that special "happy marriage" folder for emails relating to Capital, and he didn't delete emails from those folders. He specifically testified that:

---

[6] Mr. Shockey insisted that all the emails were positive and he equated them to an exchange of valentines between the parties to a happy marriage.

Q: In July of 2012 you would have had all your Capital[]-related emails stored in a Capital[] folder, right?

A: I believe so, yes.

Q: Okay. And so you don't have any reason to think that those emails would not have been ingested into the archive system, right?

A: If they were in the injected box, if you will, that would be correct.

*    *    *

Q: Okay. So how frequently, approximately, would you delete your folders?

A: Not often at all. Not – I mean it's the inbox that I'm cleaning up. . . . Once I've moved it to a folder, it's generally retained there indefinitely unless there was – I know of any reason why I would delete it at that time.

[Dkt. #203-11, Shockey Dep. at 49, 72].

So, this first excuse from BankDirect doesn't hold up against its own CEO's testimony, quite apart from the undisputed evidence that things were anything but smooth between the parties. How could all the emails for the pertinent time period be gone? Emails, after all, are an integral part of the day-to-day operations of any modern business, to say nothing of the absolutely critical role that they often play in modern litigation. Maybe there were some emails that other employees deleted that weren't transferred to the new system, but wouldn't other employees have moved at least some emails to folders as Mr. Shockey did? But that cannot be said for Mr. Shockey's Capital email folder or any of his other email folders, including – perhaps – any emails regarding Standard Funding.[7]

---

[7] For whatever reason, Mr. Shockey wasn't asked any questions about Standard Funding emails or folders for Standard Funding emails at his deposition, aside from a brief reference to his forwarding one such email to his home computer. [Dkt. #211-1, at 10-11]. For Capital's purposes, presumably the Standard Funding emails would be more important than the Capital emails in order to demonstrate (if true) that BankDirect wasn't dealing with Capital in good faith.

Ultimately, BankDirect's position is that it was all just a big mistake: any failure on its part to suspend the automatic five-year deletion protocol was inadvertent, and, in any event, because only Texas Capital could suspend the protocol, and, if that were not enough, Mr. Shockey said he erroneously thought there was a seven-year retention protocol. [Dkt. # 211, at 2]. When one looks at all of the circumstances in the case, it seems a bit much to swallow, unless we are to abandon common sense and human experience. What the Court said in *Uddin v. Holder*, 361 F. App'x 258, 260 (2nd Cir. 2010) could properly be applied here: "No reasonable adjudicator would be compelled to credit [the] explanations for the inconsistencies that it 'slipped his mind' or was a 'mistake.'" *See also Majidi v. Gonzales*, 430 F.3d 77, 80-81 (2nd Cir. 2005). Phrased differently, "[t]he mind of justice, not merely its eyes, would have to be blind to attribute such an occurrence to mere fortuity." *Avery v. Georgia*, 345 U.S. 559, 564 (1953)(Frankfurter, J, concurring).

But, in any event, Mr. Shockey is just one person. It's improbable, to say the least, that everyone else at BankDirect (and Texas Capital) was operating under the same misapprehension claimed by him. And it is even less likely that under the circumstances Mr. Shockey would not have realized early on of his "mistake." It must be remembered also that Texas Capital, the company that handled the changeover and maintained the archives, owned almost all of BankDirect and became a party to this case in December 2015, a month after BankDirect sued Capital. [Dkt. # 11]. Surely it knew what the retention protocols were. Thus, Mr. Shockey's claim of "mistake" is not to be credited. But there is more.

Texas Capital and BankDirect claim they did not suspend the five-year deletion protocol until October of 2016, eleven months after BankDirect filed suit and almost ten months after Texas Capital was sued in this case by Capital. Stunningly, Mr. Shockey said they "didn't retain or ask [Mr.

13

Fisch] to do anything before that time period," [Dkt. #203-11, Shockey Dep. at 23], even though, it bears repeating, he admitted that everyone knew from the outset that no documents were to be destroyed. By the time he did anything, it was too late to save the sought-after emails. So, despite the insinuation from BankDirect that it had to jump through some kind of flaming hoops to get Texas Capital to suspend email deletion, all it had to do was ask – if that. But, Mr. Shockey conveniently claims he did nothing; neither did Texas Capital, although its ownership of BankDirect certainly gave it a significant stake in the lawsuit, and even though it became a party to the case shortly after BankDirect sued.

As is generally the case with fallback positions, Mr. Shockey's claimed lack of concern about destroyed emails because they were all positive [Dkt. #203-11, Shockey Dep. at 24] and thus couldn't help either side is worse than the original excuse and proves the willingness of a witness to shade testimony (or worse) if the result may benefit him, directly or indirectly. *See United States v. Abel*, 469 U.S. 45, 52 (1984)("Bias may be induced by a witness' ... self-interest."); *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009) (Posner, J.)("Moreover, every judge is aware that many people who do not have a criminal record will lie in a trial when it is to their advantage."); *Energy W. Mining Co v. Oliver*, 555 F.3d 1211, 1219 (10th Cir. 2009); *United States v. Harris*, 185 F.3d 999, 1008 (9th Cir. 1999).

BankDirect also argues that "the parties did not agree to a discovery plan related to electronic information, including what search would be used and which custodians the search would apply to, until mid-October 2016." [Dkt. #211, at 6]. It is not clear why that matters, as the duty to preserve evidence is not tied to the niceties of some ultimately agreed-on discovery plan. More importantly, the fact that the parties were discussing a discovery plan long before October 2016 should have

indicated that Capital was at least interested in securing emails that went back a number of years. If in fact Mr. Shockey was operating under a misapprehension regarding the retention schedule, one would have thought he would have informed Bank Direct's lawyers about his "mistaken" understanding of the retention period, and they would have promptly (but mistakenly) have told counsel for Capital that at least a portion of the emails that were being sought could not be produced because they fell outside the retention schedule and thus, no longer existed. But that's not what happened.

Failure to mention something under circumstances when a reasonable person would do so is a factor that courts have long approved as an organon for measuring credibility. It appears in various ways. *See Georgia v. South Carolina*, 497 U.S. 376, 389 (1990); *Doyle v. Ohio*, 426 U.S. 610, 621 (1976); 3A Wigmore, *Evidence in Trials at Common Law* § 1042 at 1058 (James H. Chadbourn Rev. 1970); *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980); *AZ v. Shinseki*, 731 F.3d 1303, 1320–1321 (Fed.Cir. 2013). The concept often appears under the rubric impeachment by omission. *United States v. Useni*, 516 F.3d 634, 652 (7th Cir.2008); *United States v. Fonville*, 422 Fed.Appx. 473, 482–483 (6th Cir. 2011). The name counts for little. The principle is what counts.

We should not be understood as impugning in the slightest the integrity and good faith of the lawyers in the case, and nothing we have said should be taken as some sort of negative observation about them. "Lawyers only know what their clients tell them about historical facts, and thus, competent proof is required as to those facts." *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 432 (N.D. Ill. 2006).

**B.**

The failure to preserve electronic evidence is covered by Fed.R.Civ.P. 37(e). The provision was amended to establish the findings needed to impose curative measures – sanctions – for the nonproduction of relevant electronic evidence. *A.O.A. v. Rennert*, 2018 WL 1251827, at *2 (E.D. Mo. 2018). The amendment became effective December 1, 2015, a couple of weeks after this case was filed, but it applies to all proceedings pending on that date unless its application would be unjust or impractical. https://www.supremecourt.gov/orders/courtorders/ frcv15(update)_1823.pdf. Neither party argues that the Rule is inapplicable here, and so we shall apply it. [Dkt. #203-1, at 10-11; Dkt. # 211, at 14-15].[8]

The Rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> > (A) presume that the lost information was unfavorable to the party;

---

[8] Both parties cite the new version of the Rule. Capital then makes a case for existing Seventh Circuit case law remaining applicable in regards to the level of culpability necessary to be shown before "act[ing] with intent to deprive" under the new Rule can be found. As the Advisory Committee notes explain, "[n]egligent or even grossly negligent behavior does not support th[e] inference" that the evidence was unfavorable to the party that lost it, let alone the entry of a default judgment, which is what Capital is seeking. Advisory Committee Notes on Subdivision (e)(2).

BankDirect relies not only on pre-Amendment case law, but also relies on state law, which has been foreclosed by the Amendment. Advisory Committee Note on Subdivision (e) unambiguously states that "New Rule 37(e) . . . therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used."

16

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

"'The choice of an appropriate remedy for spoliation is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'"*Watkins v. New York City Transit Auth*., 2018 WL 895624, at *10 (S.D.N.Y. 2018). Here, we are concerned only with Subdivision (e)(2), as Capital asks for a default judgment or that the jury be given an adverse inference instruction.

## 1.

Step one is to determine whether the emails in this case "should have been preserved in the anticipation or conduct of litigation." Of course they should have! Apart from the fact that Mr. Shockey has admitted that he and everyone else knew from the beginning that documents were not to be destroyed, the duty to preserve the now unavailable information existed without the slightest doubt not only when BankDirect filed its lawsuit, but even before that, for the duty to preserve evidence "also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Travelers Prop. Cas. Co. of Am. v. Mountaineer Gas Co.*, 2018 WL 1370862, at *4 (S.D.W. Va. 2018)*. See also Hogan v. Cleveland Ave Restaurant, Inc*, 2018 WL 1417330, at *3 (S.D. Ohio 2018); *De Simone v. VSL Pharmaceuticals, Inc.,* 2018 WL 1365848, at *2 (D. Md. 2018). *See also Lewis v. McLean*, 864 F.3d 556, 565 (7th Cir. 2017)("'a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent.'");*West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2nd Cir. 1999).

This litigation did not spring into being fully formed on November 16, 2015, like Athena from Zeus's head. In fact, BankDirect should have anticipated litigation no later than in late 2014 or early 2015, when it notified Capital it would be exercising its right to purchase Capital's assets under the parties' option agreement, and Capital refused to execute the asset purchase agreement. *BankDirect Capital Fin., LLC*, 2017 WL 5890924, at *2. And BankDirect certainly knew before mid-November 2015 that it was going to sue Capital. Given the five-year preservation protocol at work in BankDirect's archive, every email from at least November 2010 on could have been saved had BankDirect acted promptly and in good faith. More, of course, could have been saved had BankDirect acted when it anticipated litigation, which was at least some months before November 2015. All BankDirect had to do was take the reasonable step of asking Texas Capital to halt the five-year deletion protocol. It was simple to do. But BankDirect waited just long enough to take appropriate action so that it could claim the loss of the emails that Capital was seeking was inadvertent.

In sum, there can be no serious doubt that the now unavailable emails ought to have been preserved, and that BankDirect, despite its admitted knowledge that documents were not to be destroyed, *intentionally* chose not to take reasonable (and quite easy) steps to preserve them. That leaves BankDirect clinging to its theory that every email from late 2010 through November 2011 was lost by 2012 – long before litigation was anticipated – when the new archive system was implemented. [Dkt. #211, at 16]. But, as much as BankDirect would like to stick to its original story that "[t]he emails that pre-dated the installation were not retained on the new email archive system" [Dkt. #203-4], it's been discredited.

The only evidence we have on the transfer of emails, Mr. Fisch's testimony, shows that when the transfer occurred, the system "ingested", as Mr. Fisch put it, all of the emails going back five years that then existed in BankDirect employees' folders. [Dkt. #203-10; Fisch Dep. at 56-58]. With its original story debunked, BankDirect latches onto the fact that emails in employees' "trash bins" or "deleted items folders" were not transferred. While Mr. Fisch testified that was so, the evidence we have – Mr. Shockey's testimony – shows that employees don't routinely delete all their emails.

Mr. Shockey, for example, said he moved the emails pertinent to this case to a special folder which would have migrated to the new archive. Other employees likely did the same.[9] So, BankDirect's changing explanations for the missing emails from late 2010 through November 2011 should not be credited. Shifting explanations can undermine credibility. *Rios v. Warden, Perry Corr Inst.*, 711 F. App'x 696, 699 (4th Cir. 2017)*; Jones v. A.W. Holdings LLC,* 484 Fed.Appx. 44, 48–49 (7th Cir.2012); *Ryder Truck Rental v. NLRB*, 401 F.3d 815, 827 (7th Cir.2005); *HCP of Illinois, Inc. v. Farbman Grp. I, Inc.*, 978 F. Supp. 2d 943, 952 (N.D. Ill. 2013). he same is true of illogical testimony. *Dickson v. A.B. Holding Co.*, 2005 WL 1828821, at *5 (E.D. Mo. 2005).

---

[9] BankDirect spends a great deal of time pointing out that it behooved employees to clean out their inboxes on a regular basis due to strict size limitations. (Dkt. #211, at 9-10, 15-16). But the evidence shows that inboxes could be kept clean by moving emails to folders and folders were definitely a part of the migration to the new archive. BankDirect refuses to address this point. But that disserves analysis and is a risky ploy. *MindGames, Inc. v. Western Pub. Co., Inc,.* 218 F.3d 652, 659 (7th 2000); *Law v. Medco Research Inc.,* 113 F.3d 781, 787 (7th Cir.1997) ("Failure to contest a point is not necessarily a waiver, but it is a risky tactic, and sometimes fatal."); *Milam v. Dominick's Finer Foods, Inc.,* 567 F.3d 830, 832 (7th Cir.2009) (Easterbrook, C.J.) ("...I take plaintiffs' silence in their response as acknowledgment").

In any event, BankDirect's argument simply ignores the fact that what they *claim* must have occurred through their employee's mistaken behavior could easily have been prevented by a simple instruction not to discard anything – an order which Shockey claimed everyone knew about, but obviously didn't follow.

19

**2.**

The next question is whether the missing information "can[] be restored or replaced through additional discovery . . . ." BankDirect claims that it can, and points to other material it has produced in discovery from the pertinent time period. These include emails from four other sources:

> (i) Gill & Roeser Holdings, Inc. ("Gill & Roeser"), BankDirect's investment banking firm that was involved in both the Capital Premium and Standard Funding transactions

> (ii) New York Community Bancorp, the former parent company of Standard Funding, which sold the assets of Standard Funding to BankDirect in June of 2011;

> (iii) Bracewell LLP, BankDirect's transactional counsel which represented it during the drafting and negotiation of the MTA and other Transaction Documents; and

> (iv) BankDirect custodians' personal email accounts.

[Dkt. #211, at 10].

BankDirect points to these extrinsic emails because it contends they address the issue of BankDirect seeking to acquire Standard Financing and tend to undermine Capital's claim regarding fraud. But of course, they do no such thing. They reveal the activities of presumably legitimate third parties who, so far as the evidence reveals, were not privy to the secret designs and activities of BankDirect and its parent that are alleged by Capital. BankDirect's offer to substitute evidence of apparently lawful activities by apparently lawful actors involved in arms-length transactions is not remotely comparable – let alone the evidentiary equivalent – of that which BankDirect has caused to be destroyed.

It cannot be denied that in the world in which we live emails of a party's employees may be the most compelling form of evidence. The value of emails and texts messages can be particularly significant in litigation due to the fact that the ease of sending or replying to such messages can cause

20

people to say things they might not otherwise say in traditional correspondence. Indeed, they are often replete with unrehearsed, spontaneous statements that surpass in simplicity and frankness and ease of understanding other far more complicated bits of evidence. *See* Michael B. Bittner, *Electronic Discovery: Understanding the Framework of Florida E-Discovery Law*, Trial Advoc. Q., Spring 2016, at 22; Lawrence D. Rosenberg, *Lawyers' Poker: Using the Lessons of Poker to Win Litigation*, 54 The Advocate (Texas) 10, 12 (2011). Simply stated, "[e]lectronic communications have the potential to ... provide the proverbial 'smoking gun.'" William A. Herbert, *The Electronic Workplace: To Live Outside the Law You Must Be Honest*, 12 Emp. Rts. & Emp. Pol'y J. 49, 5152 (2008). Of course, "automatic retention of electronic communications eliminates even the possibility of plausible deniability." *Id.* at 53. And so, automatic retention must not be allowed to function as it was intended.

Notably, BankDirect offers no caselaw or legislative history of the Rule to support its position that it substituted material will suffice. The reality is that the emails of outside professionals involved in aspects of BankDirect's business is not a substitute for the private and unguarded emails that BankDirect has wrongfully placed out of reach of Capital. Even in *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *13 (S.D.N.Y. 2017), the court rejected the argument that there was no prejudice from a failure to preserve the original version of a website even though websites can often be accessed through an archive commonly known as the "wayback machine." 2017 WL 6512353, at *13. The problem in *Leidig* was that the evidence offered in lieu of that which had been destroyed was incomplete and thus it was not the evidentiary equivalent of that which no longer existed. In the language of the Rule, the offered material was not an adequate "restoration or replacement" for that which no longer existed.

21

Although the offered substitute did not pass muster in *Leidig*, what was offered was clearly more along the lines of what the Rule requires. *See also Yoe v. Crescent Sock Co.*, 2017 WL 5479932, at *11 (E.D. Tenn. 2017)(where the "exact data copied to the hard drive cannot be restored or replaced" the court found it proper to determine whether party acted with intent to deprive opponent of that information); *Watkins v. New York City Transit Auth.*, 2018 WL 895624, at *10 (S.D.N.Y. 2018)(defendant failed to request production of same materials from its own employees or to seek to subpoena plaintiff's cell phone records).

### C.

That brings us to Subdivision (e)(2), and the question of whether BankDirect "acted with the intent to deprive" Capital of the deleted information. Indeed, in perhaps the majority of cases, that is the critical inquiry since that which has been destroyed cannot be restored or replaced. The requisite intent under the Rule is more than "negligent or even grossly negligent behavior." Advisory Committee Notes on Subdivision (e)(2). *See also Equal Employment Opportunity Comm'n v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 966 (10th Cir. 2017); *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016). That is not much different from the standard at work in the Seventh Circuit in cases antedating the Amendment to the Rule. Those cases required a showing that a party "intentionally destroy[ed] documents in bad faith," meaning "for the purpose of hiding adverse information." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 548–49 (7th Cir. 2017); *Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014)(sanction appropriate where a party displays "willfulness, bad faith, or fault"); *Norman-Nunnery*, 625 F.3d at 428 (party seeking sanctions must demonstrate that opponent intentionally destroyed the documents in bad faith).

Here, there is no "direct" evidence of intent – at least in the sense the term is most often used. But there almost never is, and, in any event, direct evidence is not needed. Circumstantial evidence will suffice. And it should. Not only is circumstantial evidence a sufficient basis on which a conviction in a criminal case can be based, *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014), but resort to circumstantial evidence is by far the most common means of proving intentional destruction of evidence. *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071 (6th Cir. 2014); *United States v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992). And if this were not enough, the Supreme Court has repeatedly stressed that circumstantial evidence is often more certain, satisfying and persuasive than direct evidence. *See Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n. 17 (1957); *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960). As Judge Easterbrook once pithily observed, "[t]he evidence was circumstantial, but what circumstances!"*Branion v. Gramly*, 855 F.2d 1256, 1258 (7th Cir. 1988). Thus, juries are routinely instructed that "[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed.2000); *see also* 4 L. Sand, J. Siffert, W. Loughlin, S. Reiss, & N. Batterman, Modern Federal Jury Instructions ¶ 74.01 (2002) (model instruction 74–2).

When it became apparent to Capital that the BankDirect e-mails were gone, BankDirect falsely blamed it on the switch of archives. (Dkt. #203-4). False exculpatory statements are often evidence of consciousness of guilt. *United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995). *See generally* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 401 [10], at 401-70 to 401-71 (1986). Of course, Texas Capital also failed to act in the interim, and it was an actual party in the case about a month after the Complaint was filed. And, it owned 90% of BankDirect. The fact that one person

at BankDirect now claims *he* mistakenly got the retention period wrong is a flimsy and unsatisfactory excuse that supports the theory that BankDirect acted – or more accurately, failed to act – with malicious intent.

But, given the circumstances at work here, the final resolution of this question should be for the jury. As it happens, the thinking behind the amended Rule allows for a number of options for deciding the intent question, including presenting the evidence at trial. Thus, the Advisory Committee Notes on Subdivision (e)(2) state:

> This finding may be made by the court when ruling on a pretrial motion, when presiding at a bench trial, or when deciding whether to give an adverse inference instruction at trial. *If a court were to conclude that the intent finding should be made by a jury*, the court's instruction should make clear that the jury may infer from the loss of the information that it was unfavorable to the party that lost it *only if the jury first finds that the party acted with the intent to deprive another party of the information's use in the litigation*. If the jury does not make this finding, it may not infer from the loss that the information was unfavorable to the party that lost it.

Advisory Committee Notes on Subdivision (e)(2) (emphasis supplied).

Here, the deletion of the emails – or the failure to stop their automatic deletion – is significant to Capital's claims against BankDirect, especially the claim that Bank Direct was going behind Capital's back and dealing with Standard and going after Capital's customers. [Dkt. # 172, ¶¶ 185-80, 196-212]. And significantly, in briefing this discovery sanctions motion, the parties have also added to the mix the ultimate resolution of the dispute underlying the preliminary injunction and the merits of Capital's claim that it had a marketing agreement with BankDirect. [Dkt. #203-1, at 5-6; #211, at 12-14, 21-23].

In *Cahill v. Dart*, 2016 WL 7034139, at *4 (N.D. Ill. 2016), Judge Lee held that the question of intent involved in the destruction of jail tapes – which was a good deal more simple than the intent

issue involved here – was best left for the jury. The analysis and resolution of the email issue here will be pertinent to the jury's consideration of and decision on BankDirect's case-in-chief and Capital's counterclaim. And a fully informed judgment will depend upon the jury's assessment of the evidence and the witnesses.

Accordingly, it is recommended that the court follow *Cahill* and, as a matter of its inherent discretion, allow the appropriate evidence to be presented to the jury, which, under proper instructions, will determine the reasons for the non-production and the impact, if any, the non-production of the challenged emails has on the merits of the parties' claims. Alternatively, if the court is not inclined to let the matter go to the jury, it is recommended that the court give a permissive spoliation instruction to the jury informing them of the destruction of the requested emails and that they *could* consider the deletion "of the emails to be evidence (*not conclusive of course*)" in considering BankDirect's claim and Capital's counterclaim. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 870 (7th Cir. 2015*)*(parenthetical in original)(emphasis supplied).

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 4/4/18

25